BUDD INTERNATIONAL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102842. Promulgated November 19, 1941.

*Henry S. Drinker, Esq., Frederick E. S. Morrison, Esq.,* and *John W. Bodine, Esq.,* for the petitioner.

*Brooks Fullerton, Esq.,* for the respondent.

OPINION.

STERNHAGEN: ■ The first matter to be determined is the petitioner's basis of gain on the sale of its Pressed Steel common in 1936. Petitioner demands the use of its own cost and respondent demands the use of the preceding owner's cost. This dispute turns upon the legal question whether the exchange in 1930 by Schroder and

the Manufacturing Co. of cash and assets, respectively, for petitioner's shares was tax-free under the Revenue Act of 1928, section 112 (b) (5).[1] If the proportions in which petitioner's shares were issued to them were the same as their proportionate ownership had been of the assets and cash which they transferred to petitioner, the exchange was tax-free, and the basis to be used by petitioner in computing gain is the same as the basis applicable to the transferor Manufacturing Co. This, it is agreed by both parties, was the $1,000,000 cost which had been paid by the Manufacturing Co. in 1926. In using this basis the Commissioner made no affirmative determination, but only adopted that figure as used by petitioner on its 1936 return upon the conception that the 1930 exchange was tax-free under section 112 (b) (5).

In lieu of the transferor's basis of $1,000,000, petitioner now demands the use of its own actual cost in 1930, and this it seeks by evidence to establish at $3,500,000. It argues that the shares issued by it in 1930 to the Manufacturing Co. and Schroder were not proportionate to the assets and cash which they respectively transferred to it, and that it is now incorrect to carry forward the Manufacturing Co.'s cost as its basis, as if section 112 (b) (5) were applicable. If that proposition be established, petitioner's next step is to prove that the actual cost to it in 1930 of the Pressed Steel common which it sold in 1936 was more than $1,000,000.

Since we are of opinion that the petitioner's cost of Pressed Steel common in 1930 has not been established at a greater figure than $1,000,000, we may adopt *arguendo* the view that the 1930 transaction was not tax-free under section 112 (b) (5). This view is only taken hypothetically, since a decision on the point is unnecessary and would be *obiter;* but we are inclined to the view that the Manufacturing Co.'s assets and Schroder's cash were not in the same ratio as the petitioner's shares which they respectively received. Both section 112 (b) (5) of the 1928 Act and section 113 (a) (8) of the 1936 Act are exceptions to the general clause of each of those sections. Unless the special facts appear which are described in those sections, the special clause has no application and the general rule applies. The general rule of section 112 (a) of the 1928 Act provides that

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

 *       *       *       *       *       *       *

(b) EXCHANGES SOLELY IN KIND.—

 *       *       *       *       *       *       *

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

the entire amount of gain shall be recognized, and the general rule of section 113 (a) of the 1936 Act provides that the basis shall be cost. Therefore, in the 1930 transaction the gain was required to be recognized, and in the 1936 sale the actual cost to the petitioner was required to be used, *unless* it was affirmatively established that the Manufacturing Co. and Schroder each received the petitioner's shares in the same ratio as their ownership in the assets and cash they transferred. There has never been an official determination that those ratios were substantially the same, and such a finding may not be made merely because that postulate was apparently used by the Manufacturing Co. on its 1930 return, which was adopted by the Commissioner, and was again used by the petitioner as the basis for gain on its 1936 return and adopted by the Commissioner. There is nothing to indicate that at any time the actual or relative values of the assets transferred by the Manufacturing Co. to petitioner in 1930 were investigated or determined. The evidence in this proceeding gives little ground for a determination of the value of all the Manufacturing Co. assets or of the ratio of such value to the $3,000,025 cash paid by Schroder. If a finding of fact were unavoidable, the evidence would tend to establish that the ratio of assets and cash transferred was not the same as the ratio of shares issued to each. Thus the Manufacturing Co. would have had a recognizable gain based upon its actual cost of the Pressed Steel shares, and petitioner would not be required to use that cost as its own basis. Petitioner's basis would be its own actual cost of the Pressed Steel shares, and this cost would be the value of such of petitioner's common shares issued to Manufacturing Co. as could be identified or allocated as the price of the Pressed Steel shares.

It can not, however, be found as a fact upon the evidence that petitioner's direct cost of the Pressed Steel common was more than $1,000,000, the figure which it used on its return. It paid 360,000 common shares for the composite group of assets and promises given by the Manufacturing Co. The $344,458.01 cash and the guaranty may properly be put aside as being clearly regarded as cost of the 1,000 shares of Pressed Steel preferred. It is impossible to assign any definite portion of petitioner's common as the cost of the Pressed Steel common. Petitioner has submitted no evidence upon which such an allocation can be based. Its proof has been directed to the value of the Pressed Steel common at the time of the exchange, and has consisted largely of the opinions of persons who were at that time in one way or another connected with the business or with the financial aspects of the exchange transactions. These opinions, however, related to the value not of the petitioner's shares given up,

but of the Pressed Steel shares received. This obviously does not determine its cost, for a purchaser's cost is not as a rule determined by the value of the property purchased. The value of all assets transferred to a newly formed corporation has sometimes been accepted as evidence of the value of all its shares; *W. S. Farish & Co.*, 38 B. T. A. 150, 158; affd., 104 Fed. (2d) 833; *Ida I. McKinney*, 32 B. T. A. 450, 456; affd., 87 Fed. (2d) 811; but the value of one of several assets transferred for less than the aggregate of the shares issued gives no help in the effort to determine the specific value of the shares issued for the particular asset. *Pierce Oil Corporation*, 32 B. T. A. 403, 430.

Since, therefore, the petitioner's cost was 360,000 common for the entire conglomeration of Manufacturing Co. assets and promises (except the Pressed Steel preferred), it is not possible to say what portion thereof is assignable as the cost of the Pressed Steel common; and this is true even though the value of the Pressed Steel common was $3,500,000, as opined by witnesses, or $2,000,000, as entered on the books. There is no ground upon which to distribute the petitioner's common among the several assets and promises received therefor; there is no proof upon which the number of shares issued as cost of the Ambi-Budd shares can be found either relatively or absolutely, and this is likewise true as to the absolute or relative number of shares to be regarded as the cost of the licenses, contracts, and promises. All of these seem to have been regarded as substantially valuable. For the purpose, therefore, of determining the cost of any part of what was received from the Manufacturing Co., it is of little or no assistance to know the several figures which witnesses regard as the value of the Pressed Steel common so received.

The issuance to Schroder of 68,572 preferred and 68,572 common for its cash of $3,000,025, while at the same time 8,000 preferred and 8,000 common were issued to the Manufacturing Co. apparently for its cash of $350,000, presents another obstacle to the proper evaluation of any portion of petitioner's common to be used as cost of the Pressed Steel common. In petitioner's brief, it is said that the 68,572 shares of common were issued to Schroder as a bonus with the 68,572 preferred. The preferred was said to have a value at that time of $43.75, which is the figure which results from dividing $3,000,025 by 68,572 preferred and dividing $350,000 by 8,000 preferred. If this value of the preferred were to be taken as the fact, it would leave the 68,572 common which were issued to Schroder and the 8,000 issued to the Manufacturing Co. as having no unit value. How then can it consistently be said that the 360,000 common are to be given the substantial value claimed for them? There is nothing in the evidence from which these two propositions can be reconciled

and nothing from which a unit value can be attributed to all the common shares. That the common had substantial value is clear enough in view of its voting rights. It is impossible, however, to go further than that upon this record and determine what that value was.

It can not be found that the Pressed Steel common acquired by the petitioner from the Manufacturing Co. in 1930 had a cost in excess of the $1,000,000 which petitioner used on its return and respondent adopted without change. This figure must remain unchanged as the basis of gain to petitioner in the sale of 1936.

■ The petitioner claims that the gain from the sale of Pressed Steel shares was incorrectly computed because the disposition of such shares was partly in a "swap" for Schroder's 68,572 International preferred shares received by it for redemption. There is not sufficient evidence to show that the transaction was in form or substance an exchange. The evidence shows that, irrespective of what may have been tentatively wished or expected, the disposition of the Pressed Steel shares was by sale to British Pacific and Schroder for separate definite money prices; and that petitioner also redeemed Schroder's 68,572 shares of International preferred at $57 a share, and retired them. These were two transactions and their close proximity in time does not unify them in a single exchange. The 332,595 Pressed Steel common were sold to the British Pacific Trust, after petitioner had paid it £16,629/15/0 for a "put", and were sold in accordance with its terms. British Pacific had no shares of petitioner and was therefore not making an exchange. The price paid, £1,122,508/2/6, was exactly the amount which British Pacific had agreed to pay, and this was credited to petitioner's account by Schroder as petitioner's banker in London. Although the stipulation states that the shares of Pressed Steel common were transferred to both the British Pacific Trust and Schroder, this is not explained and is inconsistent with the "put" and its exercise. So far, therefore, as the Pressed Steel common are concerned, there is no room for doubt that they were sold by petitioner for $5,601,315.54, the exchange equivalent of £1,122,508/2/6.

The disposition of the 81,667 shares of Pressed Steel preferred must also be regarded as a sale to Schroder for $504,303.93, the exchange equivalent of £101,062/18/3, which was credited by Schroder, in its capacity of petitioner's banker, to petitioner's account. This was the form of the transaction accepted by all concerned, and its character is not changed by the insistence of Schroeder that its holdings of International preferred shares should be redeemed. Petitioner was concerned with securing funds with which to curtail the outstanding loan by the Federal Reserve Bank to the Manufacturing Co. Its primary interest at that time was not the redemption of

its outstanding preferred. It was because of Schroder's demand that petitioner agreed to the acquisition of its 68,572 preferred, and it was adventitious that, since Schroder was both petitioner's banker and the holder of International preferred, the two transactions were accounted for on Schroder's books. All of the writings which passed between the parties to the transaction, which are in evidence, speak of the transaction as a sale by petitioner of its Pressed Steel shares for a stated price. Nowhere does it appear that the disposition of the Pressed Steel shares was to be accomplished by an exchange; and such a character can not be attributed to all or any part of the transaction consistently with what the parties said they were doing and what they actually did. The first letter on the subject, which is in evidence as Stipulation Exhibit 14, written on December 11, 1935, by Schroder to a representative of the Bank of England, describes the proposed transaction as follows:

Budd International Corporation have now received a cash bid for the whole of its holding of the Pressed Steel Company Ordinary Shares of £1 each of a price of £3. 7. 6 per Share, involving a total payment of about £1,122,500. The purchaser is the British Pacific Trust Ltd. of Cleveland Row, S. W. 1.

It is the intention of the Budd International Corporation to redeem out of the proceeds of the sale of the Pressed Steel Company's Ordinary Shares the whole of its own Preference Shares at the price of $57 per Share, with the result that £780,000 will be payable to us in redemption of our holding of these Preference Shares.

The transaction will be carried out as follows:

The total purchase price for the Pressed Steel Ordinary Shares will be paid to us in £stg. by the buyers and the Budd International Corporation will authorize us to retain for our own account £788,000 being the equivalent of $57 per Share for the redemption of the Budd International Corporation Preference Shares held by us. The balance of the purchase price, i. e. about £342,500 will be transferred to the Budd International Corporation in the United States in Dollars.

\* \* \* \* \* \* \*

\* \* \* Incidentally we ourselves are purchasing for our own account from the Budd International Corporation their holding of 81,667 Pressed Steel Company Limited 6% Preference Shares at the price of £1. 4. 9 per Share net \* \* \*.

On January 3, 1936, petitioner's directors passed a resolution to exercise the "put" and require British Pacific to buy petitioner's 332,595 Pressed Steel common at £3. 7. 6.

On February 14, 1936, petitioner's solicitors in London wrote to petitioner that the sale of the Pressed Steel common to British Pacific was completed and that British Pacific had paid to Schroder in London £1,122,508/2s/6p; that to Schroeder had been delivered 81,667 Pressed Steel preferred for a credit of £101,062/18s/3p.

We understand that Messrs. J. Henry Schroder & Co. are carrying out your instructions with regard to the purchase of your Corporation's own Preference Shares at $57 per share \* \* \*.

In view of this consistently clear treatment of the transaction as a sale by petitioner of the 332,595 shares of Pressed Steel common to British Pacific at a stated price and the 81,667 shares of Pressed Steel preferred to Schroder at a stated price, and the separate redemption of Schroder's International preferred for a fixed price of $57 per share, which petitioner was paying out of the proceeds of the sale of the Pressed Steel shares, it would be a wholly unjustified and forced construction to characterize these several transactions as a single unified exchange of Pressed Steel common and preferred for. International preferred and cash. In fact, there was no such exchange; and we see no reason now, for the sake of a tax effect, to say that petitioner should be treated as if it had made such an exchange.

It would be an impossible Procrustean task to attempt to shape the various steps to fit the conception of an exchange. Certainly British Pacific was no party to an exchange, and yet petitioner would say that the Pressed Steel common shares were to some extent exchanged for International preferred. International preferred was redeemed by petitioner at $57 a share, and this could only have been paid, as it was, to a large extent with the cash derived from British Pacific. At the fixed price at which Pressed Steel preferred was sold to Schroder, the proceeds were wholly inadequate to provide an amount sufficient to redeem the International preferred at the fixed redemption price. Furthermore, within a short time after these transactions were completed, petitioner redeemed the remaining 8,000 shares International preferred held by the Manufacturing Co. and the redemption price was at the same $57 rate as that paid to Schroder. Against this harmonious group of facts it would be wholly unwarranted to find that a swap had taken place, largely because there is testimony that petitioner's representative at the outset of the negotiations thought that a swap might be worked out and the transactions consummated in that manner.

It may be added, however, that, even if the Schroder part of the transaction could be regarded as a swap, there would still be too little support for relieving the petitioner of a tax on the resulting gain. Regulations 94, art. 22 (a)–16, in effect in 1936, were different from that considered by the Court in *Commissioner* v. *Reynolds Tobacco Co.*, 306 U. S. 110, and provided that the recognition of gain depended upon "the real nature of the transaction." See *Trinity Life Building Corporation*, 44 B. T. A. 1219; *Brown Shoe Co.*, 45 B. T. A. 212. The redemption of International preferred was not so dominant as to characterize the supposed exchange as not primarily the sale of petitioner's Pressed Steel preferred, but the redemption of its own preferred. The evidence shows, rather, that, for the purpose of getting funds with which to curtail the Manu-

facturing Co.'s indebtedness to the Federal Reserve Bank, petitioner was selling an asset. This was the dominant fact which more properly determines the "real nature of the transaction", and while we confess to some difficulty with the term "real nature of the transaction", we can not conclude that upon the evidence it is controlled by the redemption of the International preferred.

The dispositions of the Pressed Steel common and preferred were correctly treated as sales; the sale price was $5,830,990.34 (after subtracting the expense charge which is not in dispute); the basis was $1,344,458.01, and the correct gain was $4,486,532.33, as adopted in the determination of the deficiency.

■ The amount of deduction for Pennsylvania franchise tax is stipulated and the amount of the deduction for Pennsylvania income tax will, the parties agree, be computed in accordance with the Federal tax resulting from the disposition of the issues in this proceeding. Both deductions will, it is agreed, be given effect in the computation under Rule 50.

■ The petitioner claims a deduction for 1936 of the $49,400 Federal capital stock tax for the fiscal year 1935–1936 which it deducted for its income tax calendar year 1936 and which the Commissioner disallowed on the ground that it was properly deductible for the income tax year 1935. In 1935, acting upon the capital stock tax statute of August 30, 1935, petitioner on its books accrued $5,587.91 as the capital stock tax of 1935–1936. This was upon the basis of a continuation of the declared value of $4,000,000 which had been used in 1934–1935 under the 1934 Act, section 701, to which was applied the increased rate of $1.40 per $1,000 which had been imposed by the 1935 Act, section 105. The books were generally on an accrual basis. The Revenue Act of 1936, section 401, changed the rate back to $1 per $1,000 in June 1936, and petitioner, having in mind the proceeds from the sale of the Pressed Steel shares and the excess profits tax thereon, concluded to avail itself of the right to declare a new value of capital stock. It declared the value at $55,000,000, with the resulting tax of $55,000 instead of the $5,600 which it had accrued. This additional $49,400 it accrued on its books for its income tax year 1936, and deducted the amount on its 1936 income tax return. Later in 1936 it computed its capital stock tax for 1936–1937 upon the same basis of declared value of $55,000,000, accrued this capital stock tax on its books in the calendar year 1936, and deducted the tax on its 1936 income tax return. It insists upon the right to the deduction in 1936 of both amounts. The Commissioner has disallowed the $49,400 applicable to the year 1935–1936.

Upon the taxpayer's method of accounting, it must be held that the entire capital stock tax for 1935–1936, payable upon the value which it declared, was the tax which accrued in the calendar year

1935. While the amount was not stated in 1935, and indeed may not have been known as long as the declared value was not decided, the accrual of capital stock tax was an established practice, and this had been followed by the petitioner's accrual of the tax which at that time was believed by it to be the entire and correct tax. Having chosen and been allowed that method of accounting for its capital stock taxes, it had the right to use it in respect of the capital stock taxes for 1935–1936. But it could not split up the single annual tax of this year and deduct part for 1935 and the rest for 1936. Its method of accounting must be consistently used and an error or accident may not be permitted to be the means of accomplishing an obvious distortion. No point is made of the petitioner's change of valuation; and although it might have had some right, upon application, to change its accounting method if it had applied the change to the entire new tax, this question is not here. Petitioner had no right, while adhering to its accounting method and accruing one part of the year's tax, to accrue the remaining part in the following year and spread the deduction. This is made stronger by the petitioner's adherence to the adopted accounting method in the latter part of 1936, when it accrued the entire capital stock tax for 1936–1937, and deducted it on its 1936 income tax return.

■ A question is raised affirmatively by the respondent relating to the deduction taken by the petitioner on its 1937 income tax return for capital stock tax of 1937–1938. The Revenue Act of 1936 was in force in 1937 and carried the $1 capital stock tax which has been considered in the preceding point. Before the end of 1937, petitioner accrued on its books the $54,318 capital stock tax based upon its adjusted declared value of $54,318,128.80 as used in the 1936 return and deducted it on its 1937 income tax return. This was not changed by the Commissioner in determining the deficiency. By the act passed in May 1938, the provisions of the capital stock tax were changed and the petitioner availed itself of the opportunity to declare a new capital stock value. It substituted a declared value of $15,000,000 and this resulted in a capital stock tax of $15,000 instead of the $54,000 which had been accrued and deducted. The Commissioner now demands a correction of the deduction and a disallowance of the excessive $39,000.

There is no escape from the Commissioner's position. A taxpayer may not deduct more than the correct amount of the tax, irrespective of the accounting method. He may not support a deduction by making an incorrect accrual of an excessive amount, even though he is unaware of the correct amount. Such an excessive accrual is only provisional. The question which might emerge from such a mistake as to the proper treatment of a subsequent refund of an excessive

amount paid, has given rise to much discussion, see *E. B. Elliott Co.*, 45 B. T. A. 82. But there is no doubt that a correction of the original deduction when timely made while the determination of the correct tax for the original year is still in litigation, may properly be demanded and is not to be denied. The Commissioner's affirmative claim is sustained.

■ In computing the undistributed profits tax of section 14, the Commissioner allowed a credit of $654,858 for dividends paid. This was the amount of the dividend of $1.50 per share paid February 20, 1936, on the outstanding 436,572 common shares. The petitioner, however, demands additional credits, both for dividends paid on the preferred shares and for an amount alleged to be the subject of an express contractual prohibition covered by section 26.

There is no need to repeat what has been said in holding that the disposition of the Pressed Steel shares was not an exchange for International preferred. The entire proceeds of $5,830,990.34 were within the petitioner's earnings and profits for 1936 and not only the $1,922,386.34 which remained at petitioner's disposal after the International preferred purchase price to Schroder had been applied against it. The prior demand of Schroder that its International preferred should be redeemed did not have the effect of taking this amount out of petitioner's earnings and profits. It must be regarded as first coming to petitioner as income and then going from petitioner to Schroder in payment of the redemption price on International preferred. The fact that petitioner had been committed to the redemption and that Schroder used the British Pacific proceeds as payment in redemption does not make the funds so used anything other than the income they would have been if transmitted by Schroder as banker to petitioner and by it in turn sent back to Schroder as shareholder in redemption of the shares.

That under proper circumstances an amount paid to shareholders in liquidation of their shares may be regarded as the proper subject of the dividends paid credit is established by *Helvering* v. *Credit Alliance Corporation*, 122 Fed. (2d) 361. But this can not serve the petitioner in this proceeding, because it is met by the preclusion of the statute, section 27 (g), that the amount of a preferential dividend may not be the subject of a credit. When the petitioner made its payment to Schroder for the 68,572 preferred shares, it made no similar payment to Manufacturing Co. in respect of its 8,000 preferred shares and had no commitment by resolution or otherwise to make such a payment either as a dividend or in redemption. It was purchasing Schroder's 68,572 shares because Schroder required it to do so, and not because of any uniform plan to redeem all the shares of the same class outstanding. To the extent that the $57 a share paid to Schroder may have been a dividend under section 27

(f), it is not the proper subject of a credit because it was a preferential dividend under section 27 (g), *May Hosiery Mills, Inc.* v. *Commissioner*, 123 Fed. (2d) 858, affirming 42 B. T. A. 646; *Forstner Chain Corporation*, 45 B. T. A. 19.

There is also a lack of foundation for the credit under the contract provision of the statute, section 26 (c). That section provides for the credit if the taxpayer is prohibited from paying a dividend by the express terms of a contract relating to dividends. There is no such contract. The petitioner relies upon the correspondence between it and Schroder agreeing to the redemption; but construing the letters and cablegrams most favorably for petitioner, they contain nothing prohibiting the payment of a dividend. They simply agree to the purchase or redemption and fix the price at $57 a share to be paid by a debit against the British Pacific proceeds. They contain no reference to a dividend, either express or implied. Nor is there anything in the point that the terms of the preferred issue must be regarded as the terms of a contract. This contention was considered in *Lehigh Structural Steel Co.*, 44 B. T. A. 422 (on review C. C. A., 3d Cir.), and it was held that the terms of shares are not contractual within the statutory meaning and do not support the credit. See also *Belle-Vue Manufacturing Co.*, 43 B. T. A. 12; *Oregon City Manufacturing Co.*, 43 B. T. A. 212.

There is, however, ground for credit of the $98,000 dividend paid upon the 8,000 shares of preferred held by the Manufacturing Co. After petitioner had redeemed the 68,572 shares of preferred held by Schroder, the 8,000 of preferred held by Manufacturing Co. were the only shares of this class still outstanding. On February 17 and at the same time that it declared the $1.50 on the common, petitioner declared a dividend of the accumulated $12.25 a share on the outstanding preferred. This was a dividend of $98,000 which involved no preference among the holders of shares of that class. Not until March 5, 1936, were the 8,000 shares redeemed at $44.75 a share. No part of this was a dividend and the petitioner does not so contend. Its argument treats the $12.25 paid on each preferred share held by both Schroder and the Manufacturing Co. as the subject of a dividends paid credit. The reason against this is, as has been stated, that so much as was paid to Schroder was what the statute calls a preferential dividend, the credit for which is expressly prohibited. No such reason is, however, applicable to the dividend later paid on the remaining 8,000 shares held by Manufacturing Co., and therefore the credit for $98,000 may not be denied.

■ The Commissioner in the determination of deficiency held that petitioner, in surrendering Ambi-Budd shares having a cost basis of $86,704.54 for the purpose of enabling the corporation to transfer them to the syndicate participants for their acquiescence in the sale of

the Adler shares, is entitled to the deduction of only $2,000 thereof, because the surrender "constituted a sale of a capital asset." Thus the Commissioner has held that the petitioner sustained a loss (see *Peabody Coal Co.* v. *United States*, 8 Fed. Supp. 845), and relies upon the limitation of its deduction under section 117 (d), Revenue Act of 1936. This provides: "Losses from sales or exchanges of capital assets shall be allowed only to the extent of $2,000." It is applicable to corporations, *Inter-State Grocery Co.*, 39 B. T. A. 182. These shares clearly were "capital assets" as that term is defined in subdivision (b) of the section; and if they were sold or exchanged, the limitation applies. Much of the argument has been pointed at the question whether petitioner in fact sustained a loss, but that question has never been properly at issue, in view of the Commissioner's recognition that a loss was sustained, the deduction of which is limited to $2,000; so the fact of loss may be adopted, and the decision limited to the question of its deductibility.

The $2,000 limit upon gain is only applicable to the gain from sale or exchange, *Joseph A. Guthrie*, 42 B. T. A. 696, and, since the statute speaks of "gain or loss", it is likewise true that the deduction of loss is limited to the loss resulting from sale or exchange. In *Fairbanks* v. *United States*, 306 U. S. 436, it was held that the gain received by a bondholder in the redemption of his bond was not derived from a sale or exchange and was therefore not subject to the capital gain tax, but to ordinary tax. See also *Bingham* v. *Commissioner*, 105 Fed. (2d) 971; *Hale* v. *Helvering*, 85 Fed. (2d) 819. There is nothing in the circumstances of the disposition of petitioner's shares to give color to the idea that there was a sale or exchange. Petitioner received nothing, unless it be the possible effect upon its remaining shares. What the effect was does not appear; but there was nothing more tangible. It merely gave up its shares to the issuing corporation and received nothing. Since a taxpayer bondholder receiving money on redemption is held not to have disposed of his bond by sale or exchange, it is impossible consistently to say that a shareholder who surrenders his shares for no money, property, or rights is making a sale or exchange.

The undisputed loss is deductible to its full amount, and the Commissioner's limitation of the deduction is reversed.

Other matters suggested in the petition have not been covered in the trial or the briefs, and are therefore regarded as abandoned.

*Decision will be entered under Rule 50.*