**BUDD INTERNATIONAL CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 8071.**

Circuit Court of Appeals, Third Circuit.

Argued March 5, 1943.

Decided Nov. 16, 1943.

Reargued Jan. 3, 1944.

Decided July 17, 1944.

Henry S. Drinker, of Philadelphia, Pa. (Frederick E. S. Morrison and John W. Bodine, both of Philadelphia, Pa., on the brief), for petitioner.

J. Louis Monarch, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, and S. Dee Hanson, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals wherein the Board adjudged Budd International Corporation liable for deficiencies in its income and undistributed profits taxes for the years 1936 and 1937. The facts are stated in detail in the opinion of the Board of Tax Appeals, 45 B.T.A. 737. We set out herein only such of the facts as are necessary for an understanding of the issues raised by the petition.

The taxpayer was incorporated in 1930. By a series of exchanges more fully described later in this opinion the Edward G. Budd Manufacturing Company and J. Henry Schroder & Co., an English banking house, became the owners of all its outstanding shares of preferred and common stock, the Manufacturing Company acquiring a majority of the common and Schroder & Co. a majority of the preferred. In 1935 the taxpayer was called upon by the Manufacturing Company to procure some funds for it. The taxpayer owned shares of Pressed Steel Company of Great Britain, Limited, which had an immediate sales value. These shares were sold in February, 1936. The common shares were purchased by Schroder & Co. and the British Pacific Trust, Ltd. for $5,601,315.54 and the preference shares by Schroder & Co. for $503,303.93. Schroder & Co., which acted as the taxpayer's banker in this transaction, credited the taxpayer's account with $6,105,619.47. The taxpayer applied $3,908,604 of this credit to redeem its preferred shares owned by Schroder & Co. and to pay the dividends accrued on those shares. Schroder & Co. deducted $252,789.71 as its charge for expenses of the sale and gave the taxpayer credit for the remaining $1,922,386.34. The taxpayer applied these funds as follows:

| | |
|---|---|
| Retirement of preferred stock owned by the Manufacturing Company and dividends thereon .................. | $ 456,000.00 |
| Reserve for federal and state taxes ................... | 811,000.00 |
| Dividends on common stock.. | 654,858.00 |
| Cash remaining in the taxpayer's treasury ......... | 528.34 |
| Total ............... | $1,922,386.34 |

The first question presented by the petition for review is whether the taxpayer in calculating its undistributed profits tax is entitled to the credits allowed by Subsection (c) (1) of Section 26 of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 836, and by Subsection (g) which was added to Section 26 by Section 501 (a) (3) of the Revenue Act of 1942, 26 U.S.C.A. Int.Rev.Acts.

Subsection (c) (1) of Section 26 of the Revenue Act of 1936 permits a corporation which is subject to the surtax imposed upon corporate undistributed profits by Section 14 of that act, 26 U.S.C.A. Int. Rev.Acts, page 823, to compute its undistributed net income by taking credit for so much thereof as it is prohibited from paying to its stockholders in the form of dividends by "a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends." Before the Board of Tax Appeals the taxpayer argued that such a written contract prohibiting the payment of dividends to the holders of the common stock was embodied in its amended articles of incorporation and was set forth in the preferred stock certificates. The Board disposed of this argument by ruling that neither charter nor stock certificate could satisfy the statutory requirement of a written contract. This ruling is contrary to our decision in Lehigh Structural S. Co. v. Commissioner, 3 Cir., 1942, 127 F.2d 67, where the sole question was whether a stock certificate could be a contract within the meaning of Section 26 (c) (1) of the Revenue Act of 1936. We held that it could be.[1]

It was undisputed in the Lehigh Structural Steel Co. case that the charter and certificates were executed by the taxpayer in writing prior to May 1, 1936, and that the payment of dividends to the holders of the common stock was expressly prohibited until a certain portion of the taxpayer's net income had been paid into a preferred sinking fund. We held that the requirements of Section 26 (c) (1) were fully met and that the taxpayer was entitled to the claimed credit in computing its undistributed net income. In the present case it is undisputed that the amended articles of incorporation and the preferred stock certificates which included certain provisions of the amended articles were executed prior to May 1, 1936. There is, however, a controversy as to whether the provisions of the amended articles and

---

[1] Compare Warren. Tel. Co. v. Commissioner, 6 Cir., 1942, 128 F.2d 503.

preferred stock certificates are such as to be a direct prohibition against the payment by the taxpayer of dividends to the holders of the common stock.

Insofar as pertinent the amended articles of incorporation and preferred stock certificates provide that until all the preferred stock shall have been retired the taxpayer shall set aside as a sinking fund out of any earned surplus or net profits remaining after payment of dividends on the preferred stock a sum sufficient to purchase preferred stock equal to 3% of the largest number of shares of preferred ever issued and outstanding at any one time. It is then provided that "In no event so long as any of the preferred stock shall be outstanding shall any dividend whatever be paid or declared or any distribution made upon the common stock * * * until * * * full provision for the sinking fund, both current and accumulated, shall have been made."

█ The amended articles of incorporation and preferred stock certificates thus do embody a contract prohibiting the taxpayer from paying dividends to the holders of the common stock until the taxpayer has paid into a sinking fund each year an amount equal to 3% of the preferred stock. It follows that to the extent of the sinking fund payment the taxpayer was entitled to a credit in computing its undistributed net income and that the Board erred insofar as it ruled that Section 26 (c) (1) of the Revenue Act of 1936 did not entitle the taxpayer to such a credit.

In this court the taxpayer also urges that by virtue of Subsection (g), which was added to Section 26 of the Revenue Act of 1936 by Section 501 (a) (3) of the Revenue Act of 1942, it is entitled to credit in an amount equal to the profits from the sale of its Pressed Steel shares which it distributed in redemption of its preferred stock. To the extent that this distribution in redemption of the preferred stock satisfied the taxpayer's obligation to pay an amount equal to 3% of that stock into the sinking fund for its redemption, it was, as we have seen, allowable as a credit under Subsection (c) (1). The remainder of the distribution is allowable, if at all, only under Subsection (g). That subsection is by the express terms of Section 501(b) of the Revenue Act of 1942, 26 U.S.C.A. Int.Rev. Acts, made effective as of the date of the enactment of the Revenue Act of 1936. Subsection (g), however, was actually added to Section 26 after the decision by the Board in this case and consequently was not considered by the Board in arriving at its decision.

Section 26(g) provides:

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax— * * *

"(g) Stock redemption credit. An amount equal to the portion of the recognized gain, realized within the taxable year and prior to March 3, 1936, from the sale or other disposition of a capital asset, which, pursuant to such contract, was distributed prior to such date to shareholders in redemption in whole or in part of preferred stock and which is not otherwise allowable as a credit under any other provision of this section or section 27."

To entitle the taxpayer to the credit allowed by Subsection (g) the distribution of the gain from the sale of the capital asset in redemption of the preferred stock had to be made prior to March 3, 1936 and pursuant to a contract. It is undisputed that negotiations for the sale of the Pressed Steel shares began November, 1935, and that the sale was made in January, 1936, and consummated in February, 1936, when the proceeds were distributed. The requirement that the distribution be before March 3, 1936 was thus fully met.

█ Was the distribution of the proceeds from the sale of the Pressed Steel shares made "pursuant to a contract" within the meaning of this subsection? It is undisputed that there was no written contract embodied in a single document expressly providing for such a distribution. The Commissioner argues that such a contract is required. We cannot agree. In contrast to Subsection (c) (1) of Section 26 which requires a "written contract" containing a provision which "expressly deals with the payment of dividends", Subsection (g) merely requires distribution "pursuant to a contract". We do not think that the two provisions are so far in pari materia as to require that the language of the one shall be read into the other. Such was clearly not the intention of Congress in enacting Subsection (g) as appears from its legislative history.

█ The problem to which that subsection is directed was brought to the attention of Congress by representatives of this taxpayer. They pointed out the inequity

of imposing a tax by way of penalty upon a corporation for failure to distribute profits through dividends if there were no profits available for such distribution by reason of a transaction consummated before the enactment of the act.[2] It is clear that Congress, when it added Subsection (g) to Section 26 by Section 501 (a) (3) of the Revenue Act of 1942, did so for the express purpose of providing relief from the undistributed profits tax for those corporations which in good faith had distributed all the profits from the sale of a capital asset to their preferred stockholders prior to the suggestion by the President in his message to Congress on March 3, 1936 that an undistributed profits tax be imposed upon undistributed corporate profits. It is equally clear that Congress had this taxpayer in mind as one of the corporations, if not the only corporation, which would be subjected to hardship unless some ameliorating legislation were enacted. We think that Subsection (g) must be construed as applicable to any distribution of the character described therein if made pursuant to a binding agreement, even though that agreement is wholly or partly oral and even though, if written, it is not contained in a single instrument.

█ The testimony of the men who negotiated the sale of the Pressed Steel shares on behalf of the taxpayer, the cablegrams and correspondence between the taxpayer and Schroder & Co. and between Schroder & Co. and the Bank of England would indicate that it was an essential provision of Schroder & Co.'s agreement with the taxpayer for the purchase of the Pressed Steel shares that the taxpayer's preferred stock held by Schroder & Co. be redeemed out of the proceeds of the sale. The Board found as a fact that "During the course of negotiations, Schroder insisted on the retirement of its shares of petitioner's preferred as a condition of any trade with it". 45 B.T.A. 743. The Board did not determine whether this condition actually became a part of the contract into which the negotiations culminated, since, at the time of its decision Subsection (g) had not been enacted. A finding that there was a contract between the taxpayer and Schroder & Co. providing that a portion

of the gain from the sale of the Pressed Steel shares should be distributed in redemption of part or all of the taxpayer's preferred stock is, however, a necessary basis for the allowance of the taxpayer's claim for a credit under Subsection (g). The cause must, therefore, be remanded to the Tax Court, pursuant to the Commissioner's motion, for a finding as to this basic fact and an appropriate application of the law to the fact as found.

█ The Commissioner argues that even if it be conceded that such a contract existed it provided for the redemption of the preferred stock held by Schroder & Co. only and not for the redemption of the whole issue. Consequently, he says, the contract did not satisfy Subsection (g). Assuming the correctness of the premise, we see no merit in this point. The subsection refers to redemption of preferred stock "in whole or in part". There is no basis for holding that the partial redemption mentioned in the subsection refers only to a pro rata payment to all stockholders and not to a full payment to less than all. The reason for the enactment of the subsection applies equally to either case.

The second question raised by the taxpayer's petition is whether the gain from the sale of the Pressed Steel common shares should be based upon the cost of those shares to the taxpayer in 1930 or their cost in 1926 to the Manufacturing Company, which transferred them to the taxpayer in 1930. Before considering this question it is necessary to set out the facts regarding the acquisition by the taxpayer of the Pressed Steel shares from the Manufacturing Company. The Manufacturing Company is a manufacturer of all-steel automobile bodies, the manufacture of which involves the utilization of numerous patents, special processes and a special shop technique for mass production. In 1926 as part of its campaign to exploit foreign markets the Manufacturing Company acting together with Schroder & Co., caused the incorporation of Pressed Steel Company of Great Britain, Limited, to manufacture and sell in Great Britain all-steel automobile bodies which utilized the Manufacturing Company's patents, processes and shop technique.

---

[2] Hearings before the Committee on Ways and Means, House of Representatives, 77th Cong. 2d Sess. Statement of Henry S. Drinker, Esq., pp. 633–652;

Hearings Before the Committee on Finance, United States Senate, 77th Cong. 2d Sess. on H. R. 7378, Statement of Paul Zens, Volume 1, pp. 1160–1162.

Pressed Steel issued 64% of its common shares to the Manufacturing Company and the remainder of the common shares to Schroder & Co. It was stipulated that the cost of the Pressed Steel common shares to the Manufacturing Company was $1,000,-000. In addition the Manufacturing Company subscribed to 1000 of the preference shares of Pressed Steel. It paid $344,458.-01 on account, leaving 30% of the subscription price unpaid. The Manufacturing Company also purchased a majority of the common stock of Ambi-Budd Presswerk G. m.b.H., a German corporation which manufactured automobile bodies. Schroder & Co. also had an interest in that corporation. In order to provide a medium for the conduct of the Manufacturing Company's foreign business and to supply funds needed by Ambi-Budd the Manufacturing Company, Schroder & Co., and the J. Henry Schroder Banking Corporation of New York agreed in April, 1930 to incorporate the taxpayer. The taxpayer was incorporated in Delaware in August, 1930. In September, 1930, in accordance with the April agreement the Manufacturing Company transferred to the taxpayer all its common and preference shares of Pressed Steel, all its shares of common stock of Ambi-Budd, the royalties and other benefits to become due under the Manufacturing Company's contracts with Citroen, Ambi-Budd and Pressed Steel, and other miscellaneous assets in Europe. The Manufacturing Company promised to assign to the taxpayer licenses for the use of future patents and processes, to give advice and information on operation, to underwrite the taxpayer's obligation to pay dividends on its preferred shares, and to subscribe and pay for additional shares should the taxpayer be called upon to pay the remaining 30% of its subscription to the Pressed Steel preference shares. On its books the taxpayer entered the assets received by it from the Manufacturing Company at $4,650,000 itemized as follows:

7% Cumulative Participating Preference Shares of Pressed Steel Co., Ltd. (1000 shares of £100 par value each), less 30% uncalled; Ordinary Shares of Pressed Steel Co., Ltd. (38,-400 shares of £10 par value each) .................... $2,350,000.00

Common Capital Stock of Ambi-Budd Presswerk ...    500,000.00

Patents and Process Rights, Contracts and Goodwill as valued by Board of Directors as at date of acquisition $1,800,000.00

——————————

$4,650,000.00

The taxpayer issued 360,000 shares of common stock to the Manufacturing Company. It promised to pay to the Manufacturing Company $344,458.01 and to assume the Manufacturing Company's obligation for the 30% balance due on its subscription to the Pressed Steel preference shares. Simultaneously and pursuant to the April and September agreements the Manufacturing Company subscribed for 76,572 preferred and 76,572 common shares of the taxpayer's stock for $3,350,-025, and Schroder & Co., having previously agreed to take up 68,572 shares of each class, paid $3,000,025 to the Manufacturing Company which immediately paid this amount, together with $350,000 to the taxpayer. Thereupon the taxpayer paid the Manufacturing Company $350,000 in accordance with its promise (the exact promise was to pay $344,458.01). The taxpayer then issued 76,572 preferred and 76,572 common shares to the Manufacturing Company, which simultaneously transferred 68,572 of each to Schroder & Co. After the consummation of these transactions the Manufacturing Company held 8,000 or 10.45% of the taxpayer's preferred shares and 368,000 or 84.29% of its common shares. Schroder & Co. held the remainder, 68,572 preferred and an equal number of common.

Under these circumstances the taxpayer argues that the proper basis for calculating the gain from the sale of the Pressed Steel shares was their cost to the taxpayer in 1930; that the cost to the taxpayer should be measured by their then fair market value; and that their fair market value at that time was $3,500,000. The Board accepted, arguendo, the taxpayer's contention that the proper basis was the cost of the shares to the taxpayer in 1930 but ruled against the taxpayer because it concluded that the evidence produced by the taxpayer did not establish that the market value of the shares was more than $1,000,000.

The Commissioner contends that Section 113 (a) (8) (A) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 862, and Section 112 (b) (5) of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts,

page 377,[3] are applicable and that under their provisions the taxpayer must calculate its gain by using the cost of the shares to its transferor in 1926 as the proper cost basis.

Section 113 (a) (8) (A) of the Revenue Act of 1936 [4] provides that where a corporation has acquired property by the issuance of its stock or securities in a transaction described in Section 112 (b) (5) of the act the basis is the same as it would be in the hands of the transferor. Section 112 (b) describes certain types of exchanges in which no gain or loss is recognized for tax purposes. One such type of exchange described in paragraph (5) of the subsection [5] is where a person transfers property to a corporation solely in exchange for stock or securities in such corporation and immediately after the exchange is in control of the corporation. The Commissioner says that this is exactly what took place in 1930. According to his view of the facts the Manufacturing Company transferred property to the taxpayer (this property including, inter alia, Pressed Steel common shares and $3,350,-025 in cash) and received in exchange all the outstanding shares of common and preferred stock of the taxpayer. The Manufacturing Company, he contends, was thus in control of the taxpayer immediately after the exchange. This exchange, according to the Commissioner, was a separate and distinct transaction from another exchange which took place simultaneously and in accordance with the April, 1930 agreement between the Manufacturing Company and Schroder & Co. In that exchange Schroder & Co., having subscribed to 68,572 each of the taxpayer's preferred and common shares, paid $3,000,025 to the Manufacturing Company and the Manufacturing Company immediately transferred those shares to Schroder & Co.

Although there was a lapse of time between the issuance of the taxpayer's shares and their receipt by Schroder & Co. and although they were not transferred directly to Schroder & Co. but through the Manufacturing Company, the lapse of time was insignificant and the Manufacturing Company was but a conduit. The entire operation was in accordance with a prearranged plan. The separate transfers were but component steps of a single transaction. It is well settled that for income tax purposes such a transaction should be viewed as a whole. Diescher v. Commissioner of Internal Revenue, 3 Cir., 1940, 110 F.2d 90, 91; Hazeltine Corporation v. Commissioner of Internal Revenue, 3 Cir., 1937, 89 F.2d 513, 518; Bassick v. Commissioner of Internal Revenue, 2 Cir., 1936, 85 F.2d 8, 10; Halliburton v. Commissioner of Internal Revenue, 9 Cir., 1935, 78 F.2d 265, 267. If the 1930 transaction is viewed in that manner we see that what took place was that two parties, the Manufacturing Company and Schroder

---

[3] The Commissioner relies upon Section 112(b) (5) of the Revenue Act of 1928. Under the decision of this court in Forstmann v. Rogers, 3 Cir., 1942, 128 F.2d 126, it is clear that the relevant statutory provision is Section 112(b) (5) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 855, rather than the corresponding section of the earlier act. In this case the conclusion reached is not affected since the two sections are identical.

[4] "§ 113. * * * (a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—

* * * *

"(8) Property acquired by issuance of stock or as paid-in surplus. If the property was acquired after December 31, 1920, by a corporation—

"(A) by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

"(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor; * * *."

[5] "§ 112. Recognition of Gain or Loss.

"(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

"(b) Exchanges solely in kind.

* * *

"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange."

& Co., transferred their properties to the taxpayer and received its stock in exchange.

The concluding clause of Section 112 (b) (5) states that where the exchange is for property received from two or more persons the provision that no gain or loss shall be recognized is applicable "only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange." The taxpayer contends that the amount of stock received by the Manufacturing Company and Schroder & Co., respectively, was not in proportion to the interest of each in the property prior to the exchange and that Section 112 (b) (5) is therefore inapplicable. According to the taxpayer the Manufacturing Company transferred property worth $4,650,000 and received stock worth $3,508,107.20, whereas Schroder & Co. transferred property worth $3,000,025 and received stock worth $4,141,917.80. Translated into percentages the Manufacturing Company contributed 61% of the property and received 46% of the stock and Schroder & Co. contributed 39% of the property and received 54% of the stock. If the method which the taxpayer used in arriving at the values stated was proper it must be concluded that a change in proportionate interests resulted from the exchange and that it is, therefore, not a transaction of the type described in Section 112 (b) (5).

■ The total value of the properties transferred by the Manufacturing Company and Schroder & Co. respectively was recorded on the books of the taxpayer at $7,650,025. To arrive at the Manufacturing Company's property contribution the taxpayer deducted from this amount $3,000,025 which had been paid by Schroder & Co. in cash. This left $4,650,000 as the Manufacturing Company's contribution. The method used by the taxpayer to determine the value of the stock received by the Manufacturing Company and by Schroder & Co. was somewhat more complicated. The value of the stock which the taxpayer issued was recorded on its books at $7,450,025.[6] The preferred stock was without par value. However, upon liquidation and before payment to the common stockholders the preferred stockholders were entitled to receive $52 per share. To arrive at the value for the common stock the taxpayer deducted the total liquidating value

of the preferred stock at $52 per share or $3,981,744 from the value of the property. It divided the remainder, $3,668,281 by 436,572, the total number of shares of common stock. This resulted in a value of $8.40+ per share for the common stock. The Manufacturing Company received 368,000 shares of common at $8.40+ per share or $3,092,107.20 and 8,000 shares of preferred at $52 per share or $416,000, a total for both classes of $3,508,107.20; Schroder & Co. received 68,572 shares of common at $8.40+ per share or $576,173.80 and 68,572 shares of preferred at $52 per share or $3,565,744, totalling for both classes $4,141,917.80. This procedure was used by the Board of Tax Appeals and approved in United Carbon Co. v. Commissioner of Internal Revenue, 4 Cir., 1937, 90 F.2d 43 and Commissioner of Internal Revenue v. Lincoln-Boyle Ice Co., 7 Cir., 1937, 93 F.2d 26, and we are satisfied that its use was appropriate here. We think the taxpayer has proved that the exchange resulted in a change in the proportionate interests of the Manufacturing Company and Schroder & Co. The 1930 exchange was, therefore, not a transaction of the type described in Section 112 (b) (5). It follows that Section 113 (a) (8) (A) was not applicable to it and that the proper cost basis of the Pressed Steel shares was their cost to the taxpayer rather than their earlier cost to its transferor.

The Commissioner contends, and the Board found, that the taxpayer has not established by the evidence that the cost to it of the Pressed Steel shares in 1930 was greater than the cost to its transferor for the shares in 1926. As proof of the cost to the taxpayer of the Pressed Steel common shares in 1930 the taxpayer offered the testimony of four witnesses who gave their opinion as to the fair market value of those shares in that year. Mr. Sinclair, the chief fiscal officer of Pressed Steel throughout the period and Mr. Reed, the former treasurer of the Manufacturing Company, placed the fair market value at $3,500,000 and upwards; Mr. Coward and Mr. Fuller placed it at $2,000,000 and upwards. The cost to the taxpayer of the Pressed Steel shares was not their fair market value, however, but rather the fair market value of the stock of the taxpayer which it issued in exchange for them. It is true that it has been held that where all the capital stock of a newly formed cor-

---

6 The taxpayer allocated $200,000 to paid-in surplus.

poration is issued for property and there is no other method of measuring the fair market value of the stock so issued its fair market value on that date may be taken to be the equivalent of the fair market value of the property received in exchange for it. Hazeltine Corporation v. Commissioner of Int. Revenue, 3 Cir., 1937, 89 F. 2d 513.

Under the facts of the present case, however, this principle is of no aid in determining the cost of the Pressed Steel common shares to the taxpayer. Let us assume for the purpose of discussion that the taxpayer has established that the fair market value of the Pressed Steel common shares in 1930 was $3,500,000. Had the taxpayer issued its 360,000 shares solely in exchange for the Pressed Steel shares the principle would apply and it could properly be determined that the value of the 360,000 shares issued by the taxpayer for the Pressed Steel common shares and hence the cost to the taxpayer of the latter shares was $3,500,000. However, when the taxpayer issued its 360,000 shares it received in exchange not only the 38,400 Pressed Steel common shares but also Pressed Steel preference shares, shares of Ambi-Budd common stock and a heterogeneous collection of other European assets of the Manufacturing Company, as well as an agreement by the Manufacturing Company to perform future services in the operation of licenses, contracts and patent processes. Although the book value of some of these assets is recorded in the taxpayer's books the fair market value of all the assets on the day of transfer has not been, and probably could not be, shown. Furthermore, even if we should ignore the value of the other assets acquired by the taxpayer and assume that the 360,000 shares of the taxpayer's common stock were worth $3,500,000, the asserted value of the Pressed Steel common shares, so that each share was worth $9.72+ we would still be unable to solve the problem here presented since we have no way of determining how many of the 360,000 shares were issued for the Pressed Steel common shares and how many for the other assets acquired by the taxpayer at the same time. In short there are in this case too many unknown factors to permit of a valuation of the taxpayer's common shares by the application of a rule intended to provide a practical solution of the problem where there is but one unknown quantity.

■ The fair market value of the Pressed Steel shares was, therefore, of no aid in determining the value of the stock issued by the taxpayer. We agree with the Board that the taxpayer failed to prove the actual cost to the taxpayer of the Pressed Steel common shares and that the figure of $1,000,000 which had been originally used by the taxpayer and accepted by the Commissioner as the cost basis for calculating the gain from the sale of those shares, must, therefore, be allowed to stand.

The decision is reversed and the cause is remanded to the Tax Court of the United States for further proceedings not inconsistent with this opinion.

## On Rehearing.

MARIS, Circuit Judge.

Upon rehearing the taxpayer urged that the reasoning upon which we held that it was entitled to credit to the extent of the sinking fund in computing its undistributed net income also entitled it to a credit to the extent of the preferred dividends in default, plus two additional semiannual preferred dividends. In support of this contention the taxpayer calls attention to a paragraph in its amended articles of incorporation and preferred stock certificates which reads:

"The holders of preferred stock shall be entitled to receive, when and as declared by the board of directors, out of the surplus or net profits of the corporation, cumulative dividends at the rate of $3.50 per annum and no more payable semi-annually on the last days of June and December in each year, before any dividend shall be paid or set apart upon the common stock. Dividends on the preferred stock shall be cumulative * * *

"In no event so long as any of the preferred stock shall be outstanding shall any dividend whatever be paid or declared or any distribution made upon the common stock, nor shall any common stock be purchased nor shall any distribution of capital be made to the holders of common stock until after the full dividends on the preferred stock for all past semi-annual dividend periods shall have been declared and a sum sufficient for the payment thereof set apart and full provision for the sinking fund, both current and accumulated, shall have been made."

The contention disregards both the spirit and the letter of the statutory provision upon which it is based. When Congress imposed a surtax upon the undistributed net income of a corporation [1] one of its major purposes was to prevent the avoidance of surtaxes by individual stockholders achieved by the accumulation of income by the corporation. It was thought that the imposition of the surtax upon the corporation would serve to compel the distribution of corporate profits to the stockholders in order to avoid the heavy surtax. In order to avoid injustice to those corporations which could not legally pay out profits by way of dividends because they were by contract prohibited from so doing it was provided in Section 26(c) of the Act that the undistributed net income of a corporation subject to surtax should be reduced by the amount of net income which its contracts either prohibited it from distributing to its stockholders in the form of dividends or directed it to apply in payment of its indebtedness.

■ It follows, therefore, that when a corporate taxpayer was under contractual obligation prior to May 1, 1936 to pay a portion of its profits into a sinking fund which it might not use for the payment of dividends it was entitled to an equivalent reduction in the amount of its undistributed net income subject to surtax. On the other hand, a charter provision such as the one upon which the taxpayer now relies, which merely provided that in making distribution of profits the corporation must first meet its dividend obligation to one class of stockholders, the preferred, before it paid any dividends to another class, the common, was not a prohibition against the payment of dividends but simply an intracorporate agreement as to priorities in their payment. It will be noted that the language of Section 26(c) makes no distinction between the payment of dividends to the preferred and to the common. The provision of the preferred stock certificates upon which the taxpayer relies does not contain any prohibition against the payment of dividends upon the preferred stock and the prohibition against the payment of dividends on the common stock involves only the profits which the holders of the preferred stock are entitled to receive under their preference. It follows that the taxpayer is not entitled to any credit by reason of the quoted provision.

The taxpayer also urged on re-argument that we were wrong in holding that it had failed to establish by the evidence the cost to it in 1930 of the Pressed Steel common shares. We held that the cost of these shares to the taxpayer in 1930 was the value of the taxpayer's common stock which it issued in exchange for them and that since its newly issued common stock had no market value at that time its value might be ascertained by establishing the value of the property for which it was issued. This rule has frequently been applied where a newly organized corporation issues all its stock for assets the value of which can be shown. In such a case the stock, although not yet dealt in on the market, may be taken as having a value equal to that of the property for which it has just been issued. We pointed out, however, that in the present case 360,000 shares of the taxpayer's common stock were issued in a block for a group of properties consisting not only of the Pressed Steel common shares, as to the value of which there was evidence, but also of the Pressed Steel preference shares, shares of Ambi-Budd common stock and a heterogeneous collection of other European assets of the Manufacturing Company, as well as an agreement by the Manufacturing Company to perform future services in the operation of licenses, contracts and patent processes, the value of most of which was not shown by the evidence.

We held that since the value of a substantial portion of the assets received as consideration for the issuance of the block of 360,000 shares of the taxpayer's common stock was not shown the factual basis for the application of the rule was absent. We also held that even if this point should be ignored the rule could still not be applied since the proportion of the 360,000 shares of common stock which were issued for the Pressed Steel common shares and the proportion issued for the other assets was not shown. However, we did not point out another difficulty in applying the rule in this case. This difficulty arises from the fact that in addition to the 360,000 shares of the taxpayer's common stock to which we have referred, 76,572 additional shares were issued at the same time along with 76,572 shares of the taxpayer's preferred stock for a wholly independent consideration of $3,350,025 in cash. The difficulty is that the allocation of this payment be-

[1] This was done by Sec. 14 of the Revenue Act of 1936.

tween the preferred and common shares was not clearly shown by the evidence.

The taxpayer urges that these difficulties are more apparent than real; that since the value of the Pressed Steel common shares is shown by the evidence it may fairly be presumed that whatever shares of the taxpayer's common stock were issued for the Pressed Steel common shares must have had the same value as those shares. But this argument ignores the fact that we are seeking to determine the price which the taxpayer paid for the Pressed Steel common shares and not the value of those shares at the time of purchase. If the taxpayer's entire issue of common stock had been given for the Pressed Steel common shares alone the two figures might fairly be presumed to have been identical, as the taxpayer suggests. But if, as was the case, shares of the taxpayer's common stock were issued at the same time for many different assets, the assumption which the taxpayer makes is no longer likely to be valid. We cannot assume that all these assets were purchased at their exact market values, even if we assume that they had such values. On the contrary some of them may have been acquired for less and others for more than their market values, in which case the price paid—the shares of taxpayer's common stock issued for the particular asset—would have been worth more or less than the asset purchased. This necessarily follows from the fact that all shares of corporate stock of the same class are wholly interchangeable since they have the same rights, privileges and voting powers and that when it issues particular shares the issuing corporation does not give them a special lien upon or claim against the particular assets for which they were issued or any other particular assets of the issuing corporation. Each such share, therefore, must inevitably have exactly the same value as every other share of its class.

It will thus be seen that if we are to apply to the taxpayer's situation the rule which we have been discussing we must ascertain the value of each individual share of taxpayer's common stock at the time it was issued by determining the aggregate value of all the assets received for the entire issue of common stock and dividing that sum by 436,572, the total number of shares issued. The cost of the Pressed Steel common shares could then be determined by multiplying the number of shares of the taxpayer's common stock which were issued for those shares by the value of each share as thus ascertained. It is clear that the cost thus determined will equal the value of the Pressed Steel common shares only if all the shares of the taxpayer's common stock were issued in strict proportion to the values of the assets received for them, that is, if 1 share was issued for property worth $x$, 76,572 shares for property worth $76,572x$, and 360,000 shares for property worth $360,000x$.

What we have said makes it apparent that upon this record it is impossible to determine the cost of the Pressed Steel common shares by the use of the rule which the taxpayer seeks to apply. We cannot determine the value of the individual shares of the taxpayer's common stock at the time of their issuance since there is no evidence as to the value of a large part of the assets for which that stock was issued. The taxpayer, however, strongly urges that although it has not established the value of all the property for which its common stock was issued it has presented evidence from which the value of a substantial part of that property, the shares of the Pressed Steel Company, may be ascertained, and that its shares of common stock were undoubtedly worth at the time of their issuance at least as much as the Pressed Steel shares which were received in exchange for some of them. Accordingly, says the taxpayer, it should be entitled to the benefit of the minimum or partial value thus established.

There is a certain plausibility to this contention but upon analysis it will be seen to be unsound. For even if it should be found from the evidence that each share of the taxpayer's common stock had a minimum value of $y$ we cannot ascertain from the evidence how many shares having that minimum value were issued for the Pressed Steel common shares and how many for the other assets purchased with the block of 360,000 shares. If the evidence showed the value of each of the assets purchased by the issuance of this block of stock we might perhaps be justified in indulging the presumption that the shares were issued proportionately to value; for example, that 260,000 shares were issued for the Pressed Steel common shares which were worth $260,000y$ and that 100,000 shares were issued for all the remaining assets which were worth $100,000y$. In the absence, however, of any evidence as to the value of the other assets for which the 360,000 shares were in part

issued we are left without data essential to the solution of our problem. For we cannot assume that all 360,000 shares were issued for the Pressed Steel common shares and that the remaining assets were donated to the taxpayer without any consideration in common stock. Without some such assumption we have no way of telling how many shares of its common stock the taxpayer paid for the Pressed Steel common shares which it bought in 1930. We accordingly adhere to our conclusion that the Board rightly held that the taxpayer failed to prove the cost of the Pressed Steel common shares.

The judgment heretofore entered will stand as the judgment of the court.