LEROY FRANTZ, JR., AND SHEILA FRANTZ, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16188–79.    Filed August 7, 1984.

---

*Patrick J. Carr*, for the petitioners.
*Leslie J. Spiegel*, for the respondent.

STERRETT, *Judge*: In his notice of deficiency dated August 28, 1979, respondent determined a $78,440.97 deficiency in petitioners' Federal income tax for the year 1973. In an amendment to his answer, respondent asserted an additional deficiency in the amount of $13,249.03. After concessions by the parties, the primary issues remaining for decision are:

(1) Whether petitioner Leroy Frantz, Jr., sustained a loss during 1973 from surrender to a corporation, of which he was a principal common shareholder, of his preferred stock in the corporation, as well as certain advances previously made by him to that corporation; and

(2) Whether petitioner's shares of common stock in the corporation qualified as "section 1244 stock," thereby entitling petitioners to an ordinary loss on the sale of the stock during 1973 to the extent of $50,000.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

At the time they filed their petition in this case, Leroy Frantz, Jr., and Sheila Frantz, husband and wife, resided at 89 Butternut Hollow Road, Greenwich, CT. Petitioners filed a joint Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center, Holtsville, NY, which was received by the Internal Revenue Service on October 8,

1974. The amounts here in dispute relate to the activities of Leroy Frantz, Jr., and Sheila Frantz is a party to this litigation only because she filed a joint return with her husband. When used hereinafter in the singular, "petitioner" will refer to Leroy Frantz, Jr.

During 1969 through 1973, petitioner invested a substantial amount of money in eight or nine business entities.[1] Andree Biallot, Ltd. (hereinafter referred to as ABL), a corporation engaged in the business of selling perfumeries and toilet articles, was one such entity. During this same period, petitioner was not a salaried employee of any business entity, but rather devoted his time to the supervision of his investments.

ABL was organized under the laws of the State of New York and filed its certificate of incorporation on July 1, 1966. The certificate of incorporation authorized ABL to issue 4,000 shares of common stock without par value. Prior to June 30, 1971, ABL had issued 1,677 shares of common stock without par value to an aggregate of 13 shareholders. The aggregate amount received by ABL as consideration for the issuance of the 1,677 shares of common stock was at least $219,250.

From September 25, 1970, through February 1, 1971, petitioner, who was not at that time a shareholder of ABL, made advances to the corporation in the total amount of $80,000.

As of May 1971, ABL was experiencing financial difficulties and offered to its shareholders and creditors a proposed plan of reorganization and composition with creditors. Under the plan of reorganization, negotiated with old stockholders and old creditors, adopted by the board of directors at a special meeting held on June 10, 1971, and approved by the shareholders at a meeting begun on June 21, 1971, and concluded on June 30, 1971,[2] ABL authorized 500,000 shares of a new class of common stock with a par value of $0.01 per share (new common stock) and 120,000 shares of new 6-percent convertible preferred stock with a par value of $2 per share (new preferred stock) in place of the old authorized common stock (old common stock). The new preferred stock was convertible

---

[1] The terms "invest," "advance," "note," "account receivable," and "contribution to capital," and any derivatives thereof, as used in the findings of fact, are not intended to be dispositive of issues under consideration.

[2] The stipulation of facts erroneously states that the shareholders' meeting was concluded on June 30, 1981.

into ABL's new common stock. The plan provided for each share of old common stock to be exchanged for 25 shares of new preferred stock. Thus, the 1,677 shares of previously issued and outstanding common stock were exchanged for 41,925 shares of new 6-percent convertible preferred stock.

Ancillary to the plan of reorganization was a composition with creditors. Under the composition, which was negotiated with old creditors and old stockholders, each creditor classified as a "class C" creditor received shares of the new 6-percent convertible preferred stock aggregating $40 in par value for each $100 of approved claims held against ABL. Pursuant to the final composition, certain creditors' claims aggregating $383,840 in face amount were exchanged for 76,768 shares of new 6-percent convertible preferred stock.

Petitioner was a member of the group of class C creditors. On June 21, 1971, he exchanged his $80,000 in claims against ABL for 16,000 shares of the new 6-percent convertible preferred stock.[3] On his Federal income tax return filed for the taxable year 1971, petitioner claimed a $48,000 loss as a result of the exchange of the $80,000 advances made to ABL for the 16,000 shares of the new 6-percent preferred stock. Said loss was allowed by respondent after audit of petitioners' 1971 income tax return.[4]

There were 21 shareholders of new preferred stock in total, 8 as a result of conversion of old debt only, 9 as a result of conversion of old common stock only, and 4 as a result of conversion of old debt and old common stock combined. Petitioner did not own any of the old common stock and, accordingly, received the new preferred stock as a result of conversion of old debt only.

At the special meeting of the board of directors of ABL held on June 30, 1971, the board of directors adopted a plan to offer stock under section 1244, I.R.C. 1954. Under this plan, ABL was authorized to offer and issue 500,000 shares of common stock with par value of $0.01 per share. The shares were to be issued from June 30, 1971, the date the plan was adopted, to June 29, 1973, or to the date when ABL might make a subsequent offering of any stock, whichever should occur

---

[3]Petitioner, in his reply to respondent's amendment to his answer, admitted to said date of exchange. However, petitioner's preferred stock certificate is actually dated July 20, 1971.

[4]The tax treatment of this exchange is not an issue in the instant case.

sooner. The plan specifically provided that "The maximum amount to be received by the Corporation in consideration of the stock to be issued pursuant to this plan or as a contribution to capital shall be $500,000.00."

In accordance with the terms of the reorganization and composition with creditors, petitioner agreed to invest approximately $200,000 of which no less than $150,000 could be allocated to capital and surplus, and no more than $50,000 could be classified as senior indebtedness. On June 30, 1971, after adoption of the section 1244 plan, petitioner was issued 276,250 shares of new ABL common stock in exchange for a $150,000 check issued on that date, which check included payment for the stock at par value ($2,762.50) and petitioner's contribution to capital and surplus. On June 30, 1971, ABL also issued shares of common stock at $0.01 par to the following individuals, who comprised, with petitioner, all of the common shareholders of ABL:

|  | *Shares* |
| --- | --- |
| Thomas M. Biallo | 85,000 |
| Patrick J. Carr | 42,500 |
| Francis X. Weston | 21,250 |

Accordingly, 75,000 shares of authorized new common stock remained unissued as of the close of June 30, 1971.

At the June 30, 1971, meeting of the board, the following persons were elected to the positions set forth opposite their respective names:

| | |
| --- | --- |
| Leroy Frantz, Jr | Chairman of the board |
| Thomas M. Biallo | President and chief executive officer |
| Patrick J. Carr | Executive vice president and secretary |
| Marion Biallo | Vice president—public relations |
| Francis X. Weston | Treasurer and assistant secretary |

Mr. Carr was ABL's attorney from at least June 30, 1971, to December 27, 1973. Mr. Weston was ABL's accountant and, as such, prepared ABL's financial statements and corporate income tax returns.

Petitioner advanced funds to ABL as follows:

|  | *Amount* |
| --- | --- |
| Check No. 500 and note dated 6/17/71 | $6,000 |
| Check No. 508 dated 7/ 7/71 | 35,000 |

|  |  |  | Amount |
|---|---|---|---|
| Check No. 5736 | dated | 2/10/72 | $10,000 |
| Check No. 568 | dated | 3/15/72 | 6,000 |
| Check No. 569 | dated | 3/16/72 | 9,000 |
| Check No. 5765 | dated | 4/14/72 | 10,000 |
| Check No. 5783 | dated | 5/ 4/72 | 15,000 |
| Check No. 589 | dated | 6/14/72 | 25,000 |
| Check No. 230 | dated | 7/24/72 | 20,000 |
| Check No. 608 | dated | 9/12/72 | 25,000 |
| Check No. 5881 | dated | 9/29/72 | 10,000 |
| Check No. 618 | dated | 11/ 3/72 | 1,000 |
| Check No. 619 | dated | 11/10/72 | 3,100 |
| Check No. 622 | dated | 11/17/72 | 1,000 |
| Check No. 623 | dated | 11/29/72 | 13,500 |
| Check No. 651 | dated | 2/27/73 | 5,000 |
| Check No. 658 | dated | 3/14/73 | 2,000 |
| Check No. 664 | dated | 4/16/73 | 2,000 |
| Check No. 686 | dated | 7/17/73 | 1,000 |
| Total |  |  | 199,600 |

The parties agree that $41,000 of the $50,000 of senior indebtedness referred to above is represented by check No. 500 dated June 17, 1971, and check No. 508 dated July 7, 1971. The remaining $9,000 is represented by checks issued directly to Thomas M. Biallo, individually. In exchange for the $50,000 of advances constituting senior indebtedness, petitioner received from ABL a non-interest-bearing note, due on January 1, 1974. The $50,000 of advances constituting senior indebtedness was intended by petitioner and accepted by ABL as a loan.

It is unclear whether notes or other evidences of indebtedness were ever actually prepared representing the additional advances in the total amount of $158,600. However, additional advances were consistently reflected on ABL's books, records, and financial statements, which were prepared by Mr. Weston, as "loans from shareholders." The financial statements were distributed to shareholders quarterly or semiannually, and none of the shareholders ever objected to the classification of the advances as "loans." Petitioner testified that the additional advances were made without a fixed rate of interest or a fixed maturity date, and there is no evidence to refute this testimony.

On November 3, 1972, petitioner and ABL entered into a security agreement, whereby petitioner was entitled to security in ABL's accounts receivable and inventory for any loan made by petitioner from time to time thereafter. Petitioner

testified that the purpose for executing the security agreement was to gain control over corporate expenditures. The board was concerned about having the security agreement made a matter of public record and, accordingly, the agreement was not filed until several months later, in June 1973.

ABL's financial condition continued to deteriorate after the reorganization and composition with creditors. Cash-flow shortages were frequent and serious, and regular business operations were severely hindered because of lack of funds. At a November 6, 1972, meeting of the board, petitioners stated that additional advances to ABL were only being made against the security of accounts receivable. It was agreed that all members of the board actively would seek additional financing. At a January 4, 1973, meeting of the board, board members discussed their progress in seeking outside investors. Messrs. Biallo and Weston reviewed the accounts receivable situation and noted that all receivables had been pledged by ABL to secure recent advances by petitioner. Mr. Carr agreed to review the advances and prepare any necessary documentation. It was unanimously decided that only the minimum amount required to keep ABL operational would be expended, consistent with the continuing search for a new source of capital.

The board of ABL met again on April 16, 1973, to discuss the efforts being made to attract outside capital. Mr. Carr stated that it might be necessary, in order to improve ABL's balance sheet sufficiently to facilitate a sale of the outstanding common stock to third parties, for petitioner and Mr. Biallo, as principal creditors and preferred stockholders, to contribute their preferred stock and claims as creditors to the capital of the corporation. Mr. Biallo refused to surrender his preferred stock. Petitioner, however, authorized Mr. Carr to include as part of the terms to be proposed to a potential outside investor, the contribution to capital of all of his preferred stock, notes, and accounts receivable due from ABL. It was further noted that rent was 2 months in arrears. Mr. Biallo requested petitioner to advance another $2,000, and petitioner agreed to do so. Mr. Biallo agreed to pledge to petitioner, as security for petitioner's advances, his income tax refunds for the calendar years 1971 and 1972, and Mr. Carr agreed to prepare the necessary documentation evidencing the $2,000 advance and petitioner's contributions to capital.

On May 4, 1973, petitioner and ABL entered into an agreement prepared by Mr. Carr whereby petitioner surrendered all of his ABL preferred stock and canceled "all notes and accounts receivable" due to him from ABL and contributed the same "to the capital of the Company." ABL, in return, agreed to accept petitioner's "contribution * * * to its capital." The stated purpose for the contribution was to improve ABL's financial statements in order to facilitate the raising of working capital from outside sources. A similar agreement was entered on November 9, 1973, whereby petitioner agreed to surrender, and ABL agreed to accept, "all notes and accounts receivable" then due to petitioner from ABL as a "contribution to * * * capital." No other shareholder or creditor surrendered any stock or debt on either occasion.

At a June 7, 1973, meeting of the board of ABL, petitioner noted that he had made demand upon ABL for payment of certain secured demand notes representing advances to ABL made by him since November 1972. He further noted that his demands were not honored and that he considered the corporation to be in default on its obligations to him. Petitioner stated that he wished to protect his interest and that of ABL in the inventory. Mr. Biallo stated that the landlord had commenced eviction proceedings, and the board unanimously agreed that it would be prudent to move corporate assets from the leased premises to a new location as soon as possible.

A financing statement covering all inventory and accounts receivable of ABL, together with a copy of the security agreement executed on November 3, 1972, was filed on June 12, 1973, naming ABL as the debtor and petitioner as the secured party.

At a June 15, 1973, meeting of the board, the dismal financial condition of the corporation and the ongoing efforts to attract outside financing were again discussed. The decision was made, gradually to cease operating ABL as a going concern. Petitioner pointed out that he was a secured creditor of ABL and that his security interest in all inventory and accounts receivable had been perfected by filing a financing statement. Mr. Carr acknowledged that ABL was unable to pay the secured note and stated that petitioner was legally entitled to take possession of the inventory. In order to prevent seizure of the inventory by the landlord, petitioner announced

that the inventory would be moved to an office in Connecticut. He also requested that all further collections in accounts receivable be held for his benefit.[5]

On December 27, 1973, petitioner sold his 276,250 shares of ABL common stock to Interlodge Corp. for $8,000.

At all times between June 1971 and May 4, 1973, petitioner was a 65-percent common shareholder and a 13-percent preferred shareholder of ABL. From May 5, 1973, through December 27, 1973, petitioner was a 65-percent common shareholder only.

On their joint return for 1973, petitioners claimed ordinary losses on the surrender to ABL of $210,600 of "accounts and notes receivable" and $32,000 of preferred stock. They also claimed an ordinary loss of $50,000 on the sale of ABL common stock under section 1244 and claimed the remaining $92,000 loss on the common stock as a long-term capital loss.

In his notice of deficiency to petitioner, respondent determined that petitioners' basis in the surrendered notes and accounts receivable was $179,600 rather than $210,600. Respondent further determined that $9,000 of the claimed ordinary loss of $210,600 represented a nonbusiness bad debt due from Mr. Biallo and allowed the loss as a short-term capital loss. In addition, respondent determined that the claimed ordinary losses on the surrender of notes, accounts receivable, and preferred stock were not allowable, since the surrenders represented contributions to capital. Consistent with his determination that the surrenders constituted contributions to capital, respondent allowed petitioner to increase his basis in ABL common stock by his bases in the surrendered notes, accounts receivable, and ABL preferred stock.

Respondent, by an amendment to his answer, alleged that the ABL common stock sold by petitioner on December 27, 1973, was not "section 1244 stock" and, thus, petitioners are not entitled to any ordinary loss on the sale of ABL common stock.

The parties have stipulated that petitioners' basis in the surrendered stock was $32,000. Petitioners now agree and

---

[5]We note that the record is devoid of any reference to additional advances made subsequent to the May 4, 1973, surrender of "all notes and accounts receivable" due to petitioner from ABL and prior to the above-described actions. There is no explanation in the record of the legal authority on which these actions were taken.

have stipulated that $2,000 of the $210,600 claimed loss on the notes and accounts receivable properly was disallowed by respondent as an ordinary loss due to lack of substantiation. Petitioners do not agree that $9,000 of the $210,600 claimed loss on the notes and accounts receivable properly was disallowed as an ordinary loss. On brief, respondent states that he has no objection to a determination that the $9,000 was actually a debt of the corporation rather than of Mr. Biallo personally, and, as such, part of the $50,000 of senior indebtedness advanced to ABL by petitioner. In the absence of any elucidating evidence on this point, and in light of respondent's statement on brief, we find as a fact that the $9,000 debt was a debt of the corporation and was included in the $50,000 of senior indebtedness advanced to ABL by petitioner.

## OPINION

### Issue 1. Surrenders of Preferred Stock and Advances

The first issue for decision is whether petitioner sustained a loss during 1973 from the surrenders to ABL of his preferred stock and his advances made to ABL. It is petitioner's position that the surrenders resulted in ordinary losses. It is respondent's position that the surrenders constituted nondeductible contributions to capital. On brief, the parties essentially segregate the various items surrendered into three distinct categories: (1) The advances included in the $50,000 of senior indebtedness, (2) the additional advances in the total amount of $158,600, and (3) the preferred stock. In order to respond to the arguments raised with respect to each distinct category, we will similarly segregate the items surrendered in our discussion of the first issue.

### A. Advances included in the $50,000 of senior indebtedness.

Generally, the cancellation of a debt owed by a corporation to its shareholder-creditor to improve the financial structure of the corporation constitutes a contribution to the capital of the corporation. Sec. 1.61–12(a), Income Tax Regs.; *Perlman v. Commissioner*, 252 F.2d 890 (2d Cir. 1958), affg. 27 T.C. 755 (1957); *Estate of Backer v. Commissioner*, T.C. Memo. 1957–47; *Lidgerwood Mfg. Co. v. Commissioner*, 229 F.2d 241 (2d Cir. 1956), affg. 22 T.C. 1152 (1954), cert. denied 351 U.S. 951 (1956);

*Bratton v. Commissioner*, 217 F.2d 486 (6th Cir. 1954), remanding a Memorandum Opinion of this Court.[6] A contribution to capital is not a loss at the time it is made. However, the shareholder is not without benefit from the transaction, since he is entitled to add the amount of the canceled debt to the basis of his stock in the corporation. Thus, when the shareholder subsequently sells or otherwise disposes of his stock in a taxable transaction, the upward basis adjustment either reduces any realized gain or increases any realized loss. *Perlman v. Commissioner, supra*; *Lidgerwood Mfg. Co. v. Commissioner, supra*; *Bratton v. Commissioner, supra*.

Petitioner does not dispute that his advances comprising the $50,000 of senior indebtedness were loans to ABL. He, however, seeks to avoid the general rule that shareholder forgiveness of corporate indebtedness constitutes a contribution to capital by establishing that the debt constituted a worthless business bad debt and, hence, that its surrender gave rise to an ordinary loss, presumably under section 166(a)(1).

Petitioner's position is without merit. The record is devoid of any evidence that the debt in question was uncollectible at the time surrendered. At any rate, the Second Circuit, to which appeal lies in this case, has held that a shareholder's cancellation of the corporation's debt gives rise to a nondeductible contribution to capital, rather than a bad debt deduction, even if the debt is uncollectible when canceled. *Lidgerwood Mfg. Co. v. Commissioner, supra*. But cf. *Giblin v. Commissioner*, 227 F.2d 692 (5th Cir. 1955), revg. a Memorandum Opinion of this Court. Further, the evidence before us is wholly inadequate to support petitioner's assertion that he should be regarded as in the business of financing and otherwise promoting small businesses. That petitioner invested substantial amounts of money in eight or nine business entities during 1969 through 1973 and devoted a great deal of his time to supervising those investments simply does not, standing alone, establish that petitioner was in the business of financing and promoting corporations. Cf. *Whipple v. Commissioner*, 373 U.S. 193 (1963); *Smith v. Commissioner*, 62 T.C. 263 (1974). Finally, we note that petitioner claimed on his Federal income tax return for 1973, and continues to assert his entitlement to, a $50,000

---

[6]See also *Boone v. Commissioner*, T.C. Memo. 1974–152.

ordinary loss deduction under section 1244 on the sale of his ABL common stock and claimed the loss in excess of $50,000 as a long-term capital loss. Section 1244 is applicable only where the loss "would (but for this section) be treated as a loss from the sale or exchange of a capital asset." Thus, petitioner's reporting and litigating positions belie his contention that he considered himself as in the trade or business of financing and promoting small businesses and strongly indicate that he actually viewed himself as an investor. Cf. *Smith v. Commissioner, supra* at 268–269.

In view of the foregoing, we conclude that petitioner's surrender of his advances comprising the $50,000 of senior indebtedness was a contribution to capital. Hence, we hold that petitioner is not entitled to an ordinary loss on the surrender. Instead, he must add the amount of the canceled debt to the basis of his ABL common stock.

## B. Additional advances in the total amount of $158,600.

Respondent essentially maintains that the result we have reached with respect to the surrender of the advances constituting senior indebtedness equally pertains to petitioner's surrender of the additional advances in the total amount of $158,600, since these advances also constituted shareholder loans. Petitioner, on the other hand, maintains that these advances constituted an equity investment in ABL, and, therefore, their surrender should be governed by this Court's long-standing position that a shareholder's non pro rata surrender of a portion of his stock to the corporation constitutes an ordinary loss. (See discussion *infra*.) The parties have extensively argued the debt-versus-equity issue. In view of our conclusions reached below with respect to the preferred stock, we find it unnecessary to classify the advances as debt or equity, for regardless of the classification, we hold that petitioner is not entitled to an ordinary loss on his surrender of the additional advances. Instead, petitioner is entitled to increase the basis in his ABL stock by his basis in the advances.[7]

---

[7]We note that, although many of the facts tend to contradict a bona fide indebtedness with respect to the additional advances, it appears to us that respondent, taking into account a totality of the facts, has the better argument on the issue and was fully justified in treating the advances as loans.

## C. Preferred stock.

Petitioner maintains that the surrender of his preferred stock falls squarely within numerous decisions of this Court concluding that a non pro rata surrender of stock to the issuing corporation for no consideration does not constitute a contribution to capital, but instead may result in a deductible loss. See, e.g., *Smith v. Commissioner*, 66 T.C. 622, 628 (1976), revd. sub nom. *Schleppy v. Commissioner*, 601 F.2d 196 (5th Cir. 1979); *Estate of Foster v. Commissioner*, 9 T.C. 930, 934 (1947); *Miller v. Commissioner*, 45 B.T.A. 292, 299 (1941), acquiesced 1941–2 C.B. 9, acquiescence withdrawn and nonacquiescence substituted 1977–1 C.B. 2; *Budd International Corp. v. Commissioner*, 45 B.T.A. 737, 755–756 (1941), acquiesced 1942–2 C.B. 3, acquiescence withdrawn and nonacquiescence substituted 1977–1 C.B. 2, revd. on other grounds 143 F.2d 784 (3d Cir. 1944), cert. denied 323 U.S. 802 (1945). Respondent acknowledges the substantial weight of authority in this Court against his position that petitioner's surrender of his preferred stock constituted a contribution to capital, and although he seeks to distinguish those cases on the basis that the surrenders herein were primarily tax motivated, he ultimately urges us to reconsider our position. When given a similar opportunity in *Downer v. Commissioner*, 48 T.C. 86, 90–92 (1967), we noted the appeal of a contribution to capital theory, but declined at that time "to chart a new course." We now believe, however, that the time has come to reassess our position and to confess error if necessary. Recent appellate level disapproval of the position renders it inappropriate for us to continue to justify the position solely on the basis of its history. Accordingly, we feel constrained to reconsider our prior holdings in reaching a resolution of the case now before us.

The relevant cases fall principally into two categories, neither of which at this point can be considered in isolation from the other. The first category is comprised of cases where one or more shareholders transfer stock to a third party for the benefit of the corporation, such as the transferee's promise to perform future services for the corporation or the transferee's promise to extend a loan to the corporation. We have consistently held that such a transfer may give rise to a deductible loss and have specifically rejected a contribution to capital result. See, e.g., *Tilford v. Commissioner*, 75 T.C. 134

(1980), revd. 750 F.2d 828 (6th Cir. 1983), cert. denied 464 U.S. ____ (1983); *Downer v. Commissioner, supra*; *Sack v. Commissioner*, 33 T.C. 805 (1960); *Clement v. Commissioner*, 30 B.T.A 757 (1934); *City Builders Finance Co. v. Commissioner*, 21 B.T.A. 800 (1930); *Burdick, Executrix v. Commissioner*, 20 B.T.A. 742 (1930), affd. on other grounds 59 F.2d 395 (3d Cir. 1932); *Wright v. Commissioner*, 18 B.T.A. 471 (1929), modified 47 F.2d 871 (7th Cir. 1931). We have further held that such a transfer to a third party involves a "sale or exchange" and, hence, that any loss sustained is capital in nature. *Downer v. Commissioner, supra* at 92–94. The measure of the loss, where nontangible benefits incapable of independent valuation are received by the transferor-shareholder, is the difference between the shareholder's adjusted basis in the shares and their fair market value at the time of the transfer. *Downer v. Commissioner, supra* at 94.[8]

The instant case falls into the second category of cases, where one or more shareholders disproportionately surrender a portion of their stock to the issuing corporation rather than to a third party.[9] We have consistently held that such a transfer may give rise to a deductible loss and have specifically rejected a contribution to capital result. See, e.g., *Smith v. Commissioner, supra*; *Estate of Foster v. Commissioner, supra*; *Miller v. Commissioner, supra*; *Budd International Corp. v. Commissioner, supra*.[10] We have further held that the surrender to the corporation does not constitute a "sale or exchange" and, hence, that any loss sustained is ordinary in nature. *Smith v. Commissioner, supra* at 648; *Budd International Corp. v. Commissioner, supra* at 756. The measure of that loss is the basis of the shares surrendered less the increase in book value

---

[8]In *Peabody Coal Co. v. United States*, 80 Ct. Cl. 202, 8 F. Supp. 845 (1934), the Court of Claims similarly allowed a loss on a stock transfer to a third party for the benefit of the corporation. However, the court held that the amount of the loss was the full cost of the stock surrendered.

[9]Where all of the stockholders surrender a portion of their stockholdings on a pro rata basis we have determined that a nontaxable contribution to capital results. See, e.g., *Bed Rock Petroleum Co. v. Commissioner*, 29 B.T.A. 118 (1933); *Haft v. Commissioner*, 20 B.T.A. 431, 436–437 (1930); *Scoville v. Commissioner*, 18 B.T.A. 261 (1929).

[10]See also *Duell v. Commissioner*, T.C. Memo. 1960–248; *Payne Housing Corp. v. Commissioner*, T.C. Memo. 1954–85. But cf. *Murphy v. Commissioner*, a Memorandum Opinion of this Court dated July 28, 1945, where we concluded that to allow a loss on a disproportionate surrender to the issuing corporation would be "futile and indeed mischievious" if the amount of disproportion is slight. In *Northwest Motor Services Co. v. United States*, an unreported case (D.N.D. 1960, 5 AFTR 2d 1557, 60–2 USTC par. 9488), the District Court held that an ordinary loss was allowable to a "surrendering" shareholder. However, the court's recitation of the facts is not entirely clear, and the case may have involved a transfer of stock to a third party for the benefit of the corporation.

of the shares retained by the shareholder. Any reduction in the loss is added to the shareholder's basis in his retained shares. *Estate of Foster v. Commissioner, supra* at 937; *Miller v. Commissioner, supra* at 299. But cf. *Budd International Corp. v. Commissioner, supra* at 756, where we allowed the full cost basis of the stock to be taken as a deduction.

In *Schleppy v. Commissioner*, 601 F.2d 196 (5th Cir. 1979), the Fifth Circuit reversed our decision in *Smith v. Commissioner, supra*, and held that non pro rata surrenders of stock by two majority shareholders of slightly less than 2 percent of their stock to the issuing corporation did not give rise to deductible losses. Rather, the shareholders were required to add to the basis of their remaining shares the basis of the shares surrendered to the corporation. In rejecting our longstanding position, the Fifth Circuit referred to the holdings of this Court allowing a loss for a non pro rata surrender of stock by a shareholder to the issuing corporation and stated: "We find no Court of Appeals decision that determines the correctness of these decisions. We therefore write on a clean sheet." 601 F.2d at 198. The court noted the general proposition that voluntary payments by a shareholder to his corporation in order to bolster its financial position constitute nondeductible contributions to capital and could see no reason why a different result should be reached if, instead of paying cash to the corporation, the shareholder surrendered part of his shares. The real difficulty that the Fifth Circuit had was in considering the surrender transaction as a loss of any kind that would fit into the language of section 165.[11]

Notwithstanding the *Schleppy* decision, in *Tilford v. Commissioner, supra*, we based our invalidation of section 1.83–6(d), Income Tax Regs., in part, on the fact that the regulation flies in the face of our decisions holding that non

---

[11]Petitioner strongly urges that the decision in *Schleppy v. Commissioner*, 601 F.2d 196 (5th Cir. 1979), should be ignored because the Fifth Circuit so "grossly misunderstood" our decision in *Estate of Foster v. Commissioner*, 9 T.C. 930 (1947). With all due respect to the Fifth Circuit, we also disagree with the interpretation placed by that court on our opinion in *Estate of Foster*. However, it is clear that the Fifth Circuit intended to reach a result contrary to our prior position with respect to non pro rata surrenders of stock to the issuing corporation. We note that the Fifth Circuit arguably left unanswered whether it would find a deductible loss on the surrender of a substantial number of shares, resulting in a significant reduction in a shareholder's percentage of ownership in a corporation. Further, the court declined to endorse or criticize our decision in *Downer v. Commissioner*, 48 T.C. 86 (1967), which involved a transfer of stock to a third party in return for nontangible consideration.

pro rata surrenders of stock do not represent capital contributions but give rise to deductible losses. 75 T.C. at 145.[12]

The facts in *Tilford* were analogous to those in *Downer v. Commissioner, supra,* in that the taxpayer transferred stock not directly to the corporation but to corporate employees to induce them to continue work. The stock transferred in *Tilford* was subject to restrictions imposed on the transferees. The Commissioner disallowed the claimed deductions for losses on the transfers and determined that the transfers were to be treated as contributions to capital under section 1.83-6(d), Income Tax Regs. The Commissioner did not attempt to distinguish *Downer* on its facts but, in effect, argued that Congress rejected *Downer* when it adopted section 83(h) in 1969.[13] We concluded that the regulation, although based on an explicit statement in the legislative history,[14] was invalid because it exceeded the scope of the statute itself and was contrary to our numerous decisions rejecting applicability of a contribution to capital theory with respect to stock surrenders. Following *Downer,* we accordingly held that the taxpayer was entitled to capital loss deductions on the transfers of his stock.

On appeal of our decision in *Tilford,* the Sixth Circuit found the contribution to capital treatment prescribed in section

[12]The regulation in question provides as follows:

(d) *Special rules for transfers by shareholders*—(1) *Transfers.* If a shareholder of a corporation transfers property to an employee of such corporation or to an independent contractor (or to a beneficiary thereof), in consideration of services performed for the corporation, the transaction shall be considered to be a contribution of such property to the capital of such corporation by the shareholder, and immediately thereafter a transfer of such property by the corporation to the employee or independent contractor under paragraphs (a) and (b) of this section. For purposes of this (1), such a transfer will be considered to be in consideration for services performed for the corporation if either the property transferred is substantially nonvested at the time of transfer or an amount is includible in the gross income of the employee or independent contractor at the time of transfer under sec. 1.83-1(a)(1) or sec. 1.83-2(a). In the case of such a transfer, any money or other property paid to the shareholder for such stock shall be considered to be paid to the corporation and transferred immediately thereafter by the corporation to the shareholder as a distribution to which section 302 applies.

[13]Sec. 83(h) essentially allows a deduction under sec. 162 to the person for whom services are performed, which is keyed to matching the timing of the reporting of income by the employee-recipient of restricted property.

[14]The regulation is based upon the following statement in the Senate Finance Committee report on the Tax Reform Act of 1969:

"In general, where a parent company's or a shareholder's stock is used to compensate employees under a restricted stock plan, the transfer of the stock by the parent company or shareholder is to be treated as a capital contribution to the company which is to be entitled to a deduction in accordance with the restricted property rules. The parent company or the shareholder merely is to reflect the contribution as an increase of the equity in the company which is entitled to the compensation deduction. [Tax Reform Act of 1969, S. Rept 91-522 (1969), 1969-3 C.B. 500, 502.]"

1.83–6(d), Income Tax Regs., to be consistent with both the legislative history and the statutory intent of section 83(h) to embrace a theory contrary to the one underlying the *Downer* case. The court also found support for the regulation in the Supreme Court's decisions in *Deputy v. du Pont*, 308 U.S. 488 (1940), and *Interstate Transit Lines v. Commissioner*, 319 U.S. 590 (1943), holding that payments made by a stockholder for the benefit of his corporation are not deductible by the stockholder. For these reasons, and for the reasons "explicated * * * in *Schleppy v. Commissioner*," the Sixth Circuit held that our decision in *Tilford* was erroneous as a matter of law and hence, reversed.[15]

It is in this posture that we must resolve the instant case.

The major difficulty in analyzing the transaction herein is its failure to fit neatly within any distinguishable statutory category of transactions.[16] Hence, in order to prevail, petitioner must come within the loss provisions of section 165 without the assistance of any specific statutory section that defines the surrender transaction as a loss event or deems it to be such.

Petitioner's surrender clearly does not constitute a loss "incurred in a trade or business" within the meaning of section 165(c)(1). We have already concluded that petitioner was not in the "trade or business" of financing and promoting corporations. Further, the Supreme Court has made it clear

[15]Although *Tilford* involved a transfer of stock to a third party, we believe that the Sixth Circuit's opinion and its reliance on *Schleppy v. Commissioner, supra*, clearly suggest that the court would also conclude that a shareholder's non pro rata surrender of a portion of his stock directly to the issuing corporation constitutes a contribution to capital. Certainly, as a technical matter, we can perceive no reason why the Sixth Circuit would reach a contribution of capital result in a situation involving the transfer of restricted stock to a third party, but fail to reach such a result in a situation, such as that presented in the instant case, where stock is surrendered directly to the issuing corporation. See also *Webb v. United States*, 560 F. Supp. 150 (S.D. Miss. 1982), concluding that any excess value of stock over the amount received by shareholders from its sale to the corporation's business manager to induce him to continue to perform services for the corporation was a contribution to capital. But cf. *Scherman v. Helvering*, 74 F.2d 742 (2d Cir. 1935).

[16]One commentator has suggested that the rationale, although not necessarily the mechanical tests, of sec. 302 should be applied to stock-surrender transactions, see Arlinghaus, "Tax Court Questions Validity of Restricted Property Regulations," 59 Taxes 261, 264 (Apr. 1981). We have considered, but rejected, the possibility of taking such an approach, as we find no authority for doing so. Further, the abuse that sec. 302 was intended to remedy, that is, shareholder bailouts of corporate earnings and profits, clearly is not present in the stock-surrender transaction. For additional analyses of the stock surrender transaction, see Johnson, "Tax Models for Nonprorata Shareholder Contributions," 3 Va. Tax Rev. 81 (1983); Bolding, "Non-Pro Rata Stock Surrenders: Capital Contribution, Capital Loss or Ordinary Loss?", 32 Tax Law. 275 (1979); Gebhardt, "When Are Loss Deductions Available on the Voluntary Surrender of Stock?", 43 J. Tax. 22 (July 1975); O'Brien, "Stock Transfers by Shareholders to Outsiders for Nontangible Consideration," 39 Taxes 675 (Aug. 1961).

that a corporation will not ordinarily be regarded as the alter ego of its shareholders and, hence, payments by a shareholder for the benefit of the corporation are not "incurred in a trade or business" of the shareholder. *Interstate Transit Lines v. Commissioner, supra; Deputy v. du Pont, supra.* See also *Schleppy v. Commissioner, supra; Arata v. Commissioner,* 277 F.2d 576 (2d Cir. 1960), revg. in part and affg. on this issue 31 T.C. 346 (1958). Accordingly, the crucial question is whether the surrender constitutes a loss "incurred in any transaction entered into for profit" within the meaning of section 165(c)(2).

Our earlier decisions in this area unfortunately failed to demonstrate the rationale underlying their conclusions that the surrender transaction constitutes a loss event. Recognizing a similar deficiency in the cases dealing with stock transfers to third parties, we attempted to correct it in *Downer v. Commissioner, supra* at 90–91, by justifying those decisions on a "fragmented view" of stock ownership theory. In essence, the theory is based on a recognition that the shareholder's transfer of a portion of his stock represents a final disposition of those particular shares and that such a disposition is not illusory in nature, because it results in a shift in that shareholder's proportionate interest in the corporation.

Writing for the dissent in *Downer,* Judge Drennen, echoing the views expressed in Judge Murdock's dissenting opinion in *Wright v. Commissioner, supra* at 473–474, sets forth the other side of the argument. Judge Drennen believed that the majority's position, by allowing an immediate loss, failed to give proper recognition to the purpose of the stock transfer, and in doing so, closed a transaction that should have remained open. On the other hand, he felt that a contribution to capital result would properly recognize that the overall purpose of the stock transfer to a third party for the benefit of the corporation is to protect or enhance the value of the retained shares of stock. It is apparent from the following statement that Judge Drennen's major difficulty with our position with respect to stock transfers to third parties was the same problem the Fifth Circuit, in *Schleppy v. Commissioner, supra,* had with our position respecting stock surrenders to the issuing corporation; that is, an inability to fit the transaction within the statutory language authorizing a loss deduction:

One example of the murkiness in decisions concerning the allowance of losses in transactions similar to this one is in pinpointing just when the "transaction entered into for profit" commenced. It would seem that it should be when petitioner originally bought the stock, with the profit motive being inferred from the mere nature of the asset purchased, because his expenditure at that time forms the basis for his loss. If such is the case we should look to the transaction here involved * * * only to determine whether there was a closed transaction with respect to the particular stock involved which gave rise to a realized loss at that time, and, if so, whether the loss was ordinary or capital in nature. If such is the proper approach, then under circumstances such as those involved here, as said by Judge Murdock, "A relationship between the stock he gives up and that he continues to hold is thus established" and he can have no loss until he disposes of the stock he retained.

On the other hand, the cases seem to emphasize, possibly to avoid the implication that the transfer in a case like this was a gift, that the anticipated profit would arise from the increment in value of petitioner's retained stock expected to result from the services to be rendered by the recipient of petitioner's largess. This in turn suggests that the "transaction entered into for profit" was the transfer of the stock * * *. If this is true I do not think the transaction is closed until it can be determined whether the anticipated benefits will be realized, i.e., upon the sale or other disposition of petitioner's remaining stock. Otherwise it would be difficult to characterize the transfer as a "transaction entered into for profit," because if we cut it off there the transferor knows that he will suffer a loss, rather than a profit, out of this particular transaction, the loss being of his investment or basis in the stock transferred * * *. If petitioner expected * * * [the transferee's] services to increase the value of his remaining stock to the point where he could at least recover his entire investment in the corporation, then he realized no loss on the transfer. If he expected * * * [the] services to have a lesser value, then he was not entering into this transaction for a profit, but rather to avoid or reduce his losses. [48 T.C. at 95–96.]

Although the *Downer* case involved a transfer of stock to a third party for the benefit of the corporation, we believe the two opposing views set forth therein equally are representative of the two sides of the argument in cases such as the one now before us, where the shareholder disproportionately surrenders some of his stock directly to the issuing corporation. Under the fragmentation view, the surrendering shareholder is considered to have finally disposed of the particular shares surrendered; the transaction is closed; and the shareholder is entitled to an immediate loss. Under the opposing view, the surrendering shareholder is recognized as having surrendered stock for the benefit of stock he continues to hold, thereby establishing a tie between the surrendered shares and

the retained shares; the transaction remains open; and the surrendering shareholder must add the basis of the surrendered stock to the basis of the retained stock. Thus, we believe that the ultimate issue resolves itself into whether petitioner's surrender of his ABL preferred stock constituted an open or closed transaction.

In reaching a resolution of the instant case, we have carefully reconsidered the merits of the respective views. On balance, we are compelled to conclude that our prior holdings that a shareholder's non pro rata surrender of a portion of his stock to the issuing corporation constitutes a loss event were erroneous. We now believe that the considerably better view is that the surrender constitutes an open, nontaxable transaction in the nature of a contribution to capital and that the basis in the surrendered shares should be added to the retained shares. Hence, petitioner herein is not entitled to a loss on the surrender of his ABL preferred stock. Rather, he must add the basis in the ABL preferred stock to the basis in his ABL common stock. This conclusion, we believe, necessarily follows from a recognition of the purpose of the transfer, that is, to bolster the financial position of ABL and, hence, to protect and make more valuable petitioner's retained shares, and a consequent inability to fit the transaction within the statutory language authorizing a deduction for "losses incurred in any transaction entered into for profit." In other words, if we accept petitioner's alleged purpose for the surrender, we find ourselves unable to conclude that petitioner sustained a loss at the time of the transaction. To the contrary, it appears that petitioner, in surrendering his preferred stock, was attempting to decrease or avoid a loss on his overall investment. Whether petitioner would sustain a loss, and if so, the amount thereof, could only be determined when he subsequently disposed of the stock that the surrender was intended to protect and make more valuable. It would be anomalous, indeed, if a single act (not "netting") could qualify as a transaction entered into for profit and yet result in a recognized loss.

As previously noted, respondent attempted to distinguish our prior cases on the basis that the surrenders herein were primarily tax motivated in that petitioner was attempting to convert an eventual capital loss into an immediate ordinary

loss. In view of our decision that the surrender should be treated as a contribution to capital even assuming a bona fide intent to bolster ABL's financial situation, we find it unnecessary to address respondent's attempted distinction. We note, however, that we are not unaware that our prior position tended to encourage a conversion of eventual capital losses into immediate ordinary losses. We also are not unaware that our prior position, if permitted to stand, could encourage the practical equivalent of a judicial repeal of section 165(g), which treats a loss on worthless stock as a "loss from the sale or exchange, on the last day of the taxable year, of a capital asset." As is demonstrated in our prior cases and in the instant case as well, the surrendering of stock frequently occurs in cases involving a corporation in failing financial health, where the corporation's stock has substantially declined in value. Shareholders of a corporation on the verge of complete failure could, with the assistance of our prior cases, avoid the section 165(g) limitations by surrendering shares in disproportionate amounts before the stock becomes completely worthless. In such a situation it would be difficult to segregate, for purposes of disallowing the loss deduction, the desire to aid the failing corporation and protect the retained investment from the tax-planning motive of converting an eventual capital loss, generally long term in nature, into an immediate ordinary loss.[17] To perpetuate a line of authority, which we now believe is incorrect as a technical matter, seems particularly inappropriate when we consider its possible ramifications on the tax system as a whole.

In accordance with the foregoing, to the extent that our prior cases hold that a shareholder's non pro rata surrender of a portion of his stock to the issuing corporation results in an ordinary loss, they are expressly overruled.

### Issue 2. Sale of Common Stock and Section 1244

The second issue for decision is whether petitioner's shares of common stock in ABL qualified as "section 1244 stock," thereby entitling petitioners to an ordinary loss on the sale of that stock during 1973 to the extent of $50,000. This issue was

---

[17]For a further discussion of the use of the stock surrender transaction as a planning device, see Gebhardt, *supra* at 25–26.

raised in respondent's amendment to his answer and it is, thus, one on which respondent bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.

Generally, section 1244(a) provides that a loss on section 1244 stock shall, under certain circumstances, and within specified limitations, be treated as an ordinary loss. Section 1244(c) sets forth a detailed definition of the term "section 1244 stock," and each requirement of that definition must be met as a condition to securing the benefits of section 1244. One such requirement is that the corporation must have been a small business corporation at the time such plan was adopted.

Section 1244(c)(2)(A) provides as follows:[18]

(2) SMALL BUSINESS CORPORATION DEFINED.—For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan—
  (A) the sum of—
    (i) the aggregate amount which may be offered under the plan, plus
    (ii) the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation after June 30, 1958, for stock, as a contribution to capital, and as paid-in surplus,
does not exceed $500,00 * * *

In addition, section 1.1244(c)–1(c), Income Tax Regs., provides, in part:

(c) *Written plan.* (1) The common stock must be issued pursuant to a written plan * * *. The plan must specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto. * * *

The facts reveal that ABL's purported section 1244 plan was adopted on June 30, 1971. Under the plan, ABL was authorized to offer and issue 500,000 shares of common stock with a par value of $0.01 per share. The plan specifically provided that "The maximum amount to be received by the Corporation

---

[18]Sec. 1244(c) was amended by sec. 345 of Pub. L. 95–600, 92 Stat. 2844, effective for stock issued after Nov. 6, 1978. Since the stock in question was issued on June 30, 1971, all references to sec. 1244(c) and subsections thereunder refer to that section prior to amendment. Further, regulation sections referred to are those in effect during the time in question herein.

in consideration of the stock to be issued pursuant to this plan or as a contribution to capital shall be $500,000.00."

On the same day that it adopted a plan to issue section 1244 stock, ABL issued 276,250 shares of the new common stock to petitioner for $150,000 and also issued an aggregate of 148,750 shares of the new common stock to Mr. Biallo, Mr. Carr, and Mr. Weston for a total of $1,487.50. Thus, 75,000 shares of the authorized 500,000 shares of new common stock remained unissued at the close of June 30, 1971.

Prior to adopting its plan to issue section 1244 stock, ABL had issued 1,677 share of common stock without par value. ABL's restated certificate of incorporation executed in connection with ABL's reorganization and composition with creditors states that the total amount received by ABL on the issuance of the 1,677 shares of old common stock was $219,250.

Also prior to adopting the plan to issue section 1244 stock, ABL's board had adopted the plan of reorganization, under which the old common stock was to be exchanged for new preferred stock, as well as the composition with creditors, under which each class C creditor was to receive shares of new preferred stock aggregating $40 in par value for each $100 of approved claims against ABL. These plans were approved by ABL's shareholders at a meeting begun on June 21, 1971, and concluded on June 30, 1971, the same date on which ABL adopted its plan to issue section 1244 stock.

Respondent alleges that under these facts, ABL was not a small business corporation at the time it adopted its plan to issue section 1244 stock, because at the time of the adoption of the plan, the aggregate amount which could be offered under the plan ($500,000) plus the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation for stock after June 30, 1958, exceeded $500,000. Respondent asserts that both the $219,250 received by ABL for the old common stock issued prior to June 30, 1971, and the $383,840 in claims exchanged for preferred stock pursuant to the composition with creditors must be considered in determining whether ABL was a small business corporation. Peti-

tioner, on the other hand, alleges that the preferred stock issued pursuant to the composition with creditors was not issued physically until July 20, 1971, and, hence, that the creditors' claims exchanged for preferred stock should not be considered in determining whether ABL was a small business corporation at the time it adopted its plan to issue section 1244 stock. Petitioner further contends that, even if these claims are to be taken into account, respondent has not satisfied his burden of proving ABL's basis in the claims acquired in a taxable exchange for ABL's preferred stock.

We see no need to probe into the questions raised with respect to the issuance of the preferred stock for creditors' claims, for resolution of those questions would not alter our conclusion that ABL was not a small business corporation within the meaning of section 1244(c)(2)(A). As we read ABL's alleged section 1244 plan, ABL was authorized to receive a maximum amount of $500,000 for issuance of stock pursuant to its plan. Hence, as respondent points out, and under a straightforward reading of section 1244(c)(2)(A), since the aggregate amount which could have been offered under the plan alone was $500,000, ABL could not have qualified as a small business corporation at the time the plan was adopted if, between June 30, 1958, and the time the plan was adopted, even $1 had been received by ABL for stock, as a contribution to capital, or as paid-in surplus. Cf. sec. 1.1244(c)–2(d), example (1), Income Tax Regs. Yet, ABL's restated certificate of incorporation states that ABL had received $218,250 as consideration for the issuance of the 1,677 shares of old common stock issued prior to June 30, 1971. Further, petitioner specifically admitted in his reply to respondent's amendment to his answer that he surrendered his $80,000 in creditor claims against ABL in exchange for 16,000 share of new preferred stock on June 21, 1971, and although the value of those claims is disputed, it is clear that they were not valueless and that ABL had some basis in the claims. Hence, since at the time it adopted its section 1244 plan, ABL had clearly received some money and property in which ABL acquired an adjusted basis and since, under ABL's plan, ABL could have received an aggregate amount of $500,000 for stock issued pursuant thereto, ABL's plan fails to fix a permissible limit on the amount that could have been received for stock issued pursu-

ant thereto. It follows that ABL was not a small business corporation at the time it adopted its alleged section 1244 plan, and, consequently, petitioner's common stock did not qualify as section 1244 stock.

Petitioner has not argued, except possibly by implication, that the plan's statement that "The maximum amount to be received by the Corporation in consideration of the stock to be issued pursuant to this plan *or* as a contribution to capital shall be $500,000.00" (emphasis added) was intended to encompass the amounts referred to in both clause (i) and clause (ii) of section 1244(c)(2)(A). Nor would such an argument be of any avail to petitioner, because if such were the case, we would be compelled to conclude that the plan did not specifically state, in terms of dollars, the maximum amount to be received by ABL in consideration for the stock to be issued pursuant thereto as required by section 1.1244(c)–1(c)(1), Income Tax Regs., and the numerous decisions upholding the validity of that regulation. See, e.g., *Spillers v. Commissioner*, 407 F.2d 530, 533 (5th Cir. 1969), affg. a Memorandum Opinion of this Court; *Malinowski v. Commissioner*, 71 T.C. 1120, 1127 (1979); *Mogab v. Commissioner*, 70 T.C. 208, 212–213 (1978); *Siebert v. Commissioner*, 53 T.C. 1, 5 (1969); *Godart v. Commissioner*, 51 T.C. 937, 943–944 (1969), affd. 425 F.2d 633 (2d Cir. 1970); *Morgan v. Commissioner*, 46 T.C. 878 889 (1966).

In light of our conclusion that ABL was not a small business corporation within the meaning of section 1244(c)(2)(A), and, hence, that petitioner's common stock in ABL did not qualify as section 1244 stock, we need not address respondent's additional argument that ABL failed to comply with section 1244(c)(1)(C), which requires that no portion of a prior offering be outstanding at the time the plan was adopted.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

DAWSON, WILBUR, CHABOT, NIMS, WHITAKER, SHIELDS, COHEN, SWIFT, JACOBS, and GERBER, *JJ.*, agree with the majority opinion.

SIMPSON, KÖRNER, HAMBLEN, and CLAPP, *JJ.*, did not participate in the consideration of this case.

PARKER, *J.*, dissenting in part: I cannot join the majority opinion insofar as it disallows petitioner's loss deductions for the stock he surrendered.

In 1929, a majority of the Board of Tax Appeals held that a shareholder who had surrendered some of his shares to the issuing corporation for its benefit had incurred a deductible loss. *Wright v. Commissioner*, 18 B.T.A. 471 (1929), modified on another issue 47 F.2d 871 (7th Cir. 1931). Until today, this Court had never wavered from its holding that a shareholder's disproportionate transfer of stock to the issuing corporation or to a third party for the benefit of the corporation is a disposition of property in which the shareholder's loss is recognized. We had so held where the transfer was directly to a third party, such as a corporate employee or creditor,[1] a view supported by other courts as well.[2] We had so held where the transfer was to the corporation as part of a plan to transfer the stock to a third party.[3] Finally, in the specific context of this case, we had held that the taxpayer incurred a deductible loss where the non pro rata transfer was to the corporation for it to cancel the shares or to hold them as treasury stock.[4] I think that these decisions are sound in law and policy. Today, the majority overrules these decisions on the basis of arguments considered and rejected many times before. I dissent from the majority's abandonment of this consistent, substantial, and well-reasoned body of case law.

In its zeal to prevent the perceived abuse of an ordinary loss deduction from the disposition of a capital asset, the majority misapplies the basic rules of loss recognition. Loss recognition

---

[1] *Burdick, Executrix v. Commissioner*, 20 B.T.A. 742 (1930) (Board reviewed), affd. 59 F.2d 395 (3d Cir. 1932); *City Builders Finance Co. v. Commissioner*, 21 B.T.A. 800 (1930) (Board reviewed); *Clement v. Commissioner*, 30 B.T.A. 757 (1934) (Board reviewed); *Sack v. Commissioner*, 33 T.C. 805 (1960); *Downer v. Commissioner*, 48 T.C. 86 (1967) (Court reviewed); *Tilford v. Commissioner*, 75 T.C. 134 (1980) (Court reviewed), revd. 705 F.2d 828 (6th Cir. 1983), cert. denied 464 U.S. ____ (1983).

[2] *Scherman v. Helvering*, 74 F.2d 742 (2d Cir. 1935); *Berner v. United States*, 151 Ct. Cl. 128, 282 F.2d 720 (1960); *Peabody Coal Co. v. United States*, 80 Ct. Cl. 202, 8 F. Supp. 845 (1934); *Kress v. Stanton*, 98 F. Supp. 470 (W.D. Pa. 1951), affd. per curiam 196 F.2d 499 (3d Cir. 1952); compare *Webb v. United States*, 560 F. Supp. 150 (S.D. Miss. 1982).

[3] *Wright v. Commissioner*, 18 B.T.A. 471 (1929) (Board reviewed), modified on another issue 47 F.2d 871 (7th Cir. 1931); *Budd International Corp. v. Commissioner*, 45 B.T.A. 737 (1941), revd. on other grounds 143 F.2d 784 (3d Cir. 1944), cert. denied 323 U.S. 802 (1945); *Estate of Foster v. Commissioner*, 9 T.C. 930 (1947) (Court reviewed).

[4] *Miller v. Commissioner*, 45 B.T.A. 292 (1941); *Smith v. Commissioner*, 66 T.C. 622 (1976), revd. sub nom. *Schleppy v. Commissioner*, 601 F.2d 196 (5th Cir. 1979). See also *Duell v. Commissioner*, T.C. Memo. 1960–248; *Payne Housing Corp. v. Commissioner*, T.C. Memo. 1954–85.

and loss characterization are related but separate inquiries. An individual taxpayer may deduct losses incurred during the taxable year from transactions entered into for profit. Sec. 165(a), (c)(2). Essential to loss recognition is that the transaction be "closed" during the year for which the loss is claimed, fixed by identifiable events occurring in that year. Sec. 1.165–1(d)(1), Income Tax Regs.

The majority erroneously concludes that a disproportionate or non pro rata surrender of shares of stock is an "open" transaction, reasoning that the fact and amount of the shareholder's loss can be ascertained only when he has disposed of his remaining shares. When considering a claimed loss from a disposition of property, we must focus on the precise property for which the loss was claimed. The majority's open transaction analysis stands up only if the shareholder's *entire* stock investment is viewed as a single, indivisible property unit. This is the "unitary view" of stock ownership, which until today we have always rejected. Indeed, until today the cases were uniformly to the contrary. I doubt that the majority means to suggest that a shareholder who disposes of a portion of his shares at a gain, to enhance the value of his remaining stock investments, may postpone his recognition of that gain by reducing his basis in his remaining shares.[5] Consistent application of the majority's unitary view, however, would seem to require that result.

The property disposed of in this case and for which the loss deduction was claimed was *only* the stock that petitioner had surrendered. When viewed in this light, the majority's open transaction analysis fails. This approach is the "fragmented view" or fractional view of stock ownership, which, until today, was the rule in this Court. Under the "fractional view," each individual share is a separate property unit, and absent a specific statutory provision, gain or loss is recognized on the disposition of each discrete share. Each share of stock represents a fractional ownership interest in a corporation consisting of three elements—the right to dividends, the right to

---

[5]Under the now-overruled cases, a surrendering shareholder has an amount realized measured by the enhanced value of his remaining shares resulting from the surrender. *Smith v. Commissioner, supra; Miller v. Commissioner, supra.* Given the numerous ways one can acquire stock, it is not implausible that a shareholder surrendering stock would have a basis in the surrendered stock of less than its present fair market value.

assets on dissolution, and, in most cases, the right to vote in the corporation's affairs. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 14.31, at 14–94—14–95 (4th ed. 1979). When a shareholder disposes of a share of stock, those rights are lost, and his aggregate interest in the corporation in comparison to the interests of the other shareholders has been changed.[6] Such a change results regardless of the method and character of the stock disposition. See *Downer v. Commissioner*, 48 T.C. 86, 90–91 (1967). With a non pro rata surrender of shares to the issuing corporation, what the shareholder has after the surrender is not what he had before the surrender.

Outside of the area of stock transfers to or for the benefit of the corporation, the case law similarly reflects the fractional view of stock ownership. A shareholder disposing of stock must proceed essentially share by share; he cannot aggregate his bases and his amounts realized. *Curtis v. United States*, 336 F.2d 714, 722 (6th Cir. 1964); *Mahaffey v. Commissioner*, 1 T.C. 176, 182–183 (1942), revd. on another issue 140 F.2d 879 (8th Cir. 1944). Cf. *Sicanoff Vegetable Oil Corp. v. Commissioner*, 27 T.C. 1056, 1071–1072 (1957). The tax law generally favors a fractional, divisible view of property, seeking to allocate basis and recognize gain or loss immediately when a part of a larger property is disposed of. See sec. 1.61–6(a), Income Tax Regs.;[7] *Foster v. Commissioner*, 80 T.C. 34, 216–217 (1983); *Fasken v. Commissioner*, 71 T.C. 650, 655–657 (1979).

The majority also suggests that the unitary view is necessary in order to find a transaction entered into for profit. In other words, the majority treats the stock surrender, itself, rather than the original investment in stock as the transaction

---

[6]Only where the shareholder's overall interest is unchanged because of a pro rata transfer by all shareholders of a portion of their shares does the disposition of stock constitute a nontaxable, nondeductible contribution to capital. *Bed Rock Petroleum Co. v. Commissioner*, 29 B.T.A. 118 (1933); *Haft v. Commissioner*, 20 B.T.A. 431, 436–437 (1930); *Scoville v. Commissioner*, 18 B.T.A. 261 (1929). See also *Kistler v. Burnet*, 58 F.2d 687 (D.C. Cir. 1932), affg. *Fredericks v. Commissioner*, 21 B.T.A. 433 (1930); *Taylor v. MacLaughlin*, 30 F. Supp. 19 (E.D. Pa. 1939).

[7]Sec. 1.61–6(a), Income Tax Regs., provides in pertinent part:

"When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. Thus, gain or loss shall be determined at the time of sale of each part and not deferred until the entire property has been disposed of."

entered into for profit. To avoid the conclusion that the surrender, if viewed as a closed transaction, was not profit motivated, the majority finds the requisite profit objective in the taxpayer's hope that the value of his remaining stock investment will be protected and enhanced. Whether this anticipated benefit will materialize cannot be ascertained until the disposition of the remaining shares. Hence, the majority concludes, the transaction is still open, and thus the taxpayer, as yet, has realized no loss. Again, I disagree.

Generally, the requisite profit objective for dealings in property is established (or not established) when the property is acquired. See B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 25.3 (1981).[8] The discussion of the taxpayer's reasons for surrendering the stock—enhancing the value of the corporation and hence the value of his remaining shares—is to negate the Government's argument that the surrender was a gift. See *Mack v. Commissioner*, 45 B.T.A. 602 (1941), affd. 129 F.2d 598 (2d Cir. 1942), denying the taxpayer a loss deduction on the ground that the surrender was a gift. Once the taxpayer has disproved respondent's claim that the stock surrender was for personal (not profit motivated) reasons, the profit objective of his initial stock acquisition characterizes its disposition.

Nothing in the recent reversals by the Fifth and Sixth Circuits requires the majority's abandonment of this Court's long-held "fragmented view" of stock ownership. See *Tilford v. Commissioner*, 705 F.2d 828 (6th Cir. 1983), revg. 75 T.C. 134 (1980), cert. denied 464 U.S. ____ (1983); *Schleppy v. Commissioner*, 601 F.2d 196 (5th Cir. 1979), revg. *Smith v. Commissioner*, 66 T.C. 622 (1976).[9] The majority states, and I agree, that the direct-surrender cases and third-party transfer cases must be considered together. Given this analytical framework, I find the majority's reliance upon the Fifth Circuit's *Schleppy* opinion misplaced. The majority and I both agree that the *Schleppy* court totally misread our opinion in *Estate of Foster*

---

[8]Of course, losses from a transaction entered into primarily for tax benefit rather than for economic profit will not be recognized. See *Knetsch v. United States*, 172 Ct. Cl. 378, 348 F.2d 932 (1965); *Fox v. Commissioner*, 82 T.C. 1001 (1984); *Smith v. Commissioner*, 78 T.C. 350 (1982). The majority, however, has expressly declined to address respondent's argument that the transaction in this case was primarily tax motivated.

[9]Barring stipulation to the contrary, this case is appealable to the Second Circuit.

*v. Commissioner*, 9 T.C. 930 (1947).[10] The *Schleppy* court did not consider the third-party cases and the .direct-surrender cases together. The Fifth Circuit's attempt to distinguish *Downer v. Commissioner, supra*, as involving a transfer to a third party rather than a surrender to the corporation epitomizes its mischaracterization of the issue.[11] The Fifth Circuit suggested that after the transfer of stock to a third party, Downer had something less than what he had had before the transfer, but that in *Schleppy*, the taxpayer somehow had the same interest in the corporation after the surrender of stock as he had had before the surrender. I believe this is wrong and that the error arises from an implicit reliance on a "unitary view" of a shareholder's stock investment. The Fifth Circuit also analogized Schleppy's surrender of shares of stock to a cash contribution to the corporation. Again, this disregards the fact that a cash contribution does not change a shareholder's proportionate interest in the corporation vis-à-vis the other shareholders, whereas the non pro rata surrender of shares, does.

I also do not read as much into the Sixth Circuit's reversal in *Tilford v. Commissioner, supra*, as does the majority. The clear focus of the Sixth Circuit's *Tilford* opinion was section 83 and section 1.83–6(d), Income Tax Regs., which that court read as legislatively changing the result in *Downer v. Commissioner, supra*. The *Tilford* court's passing reference to *Schleppy v. Commissioner, supra*, cannot be read as rejecting our "fragmented view" of stock ownership or as embracing the Fifth

---

[10]In *Foster*, the issue was the taxpayer's basis in shares he sold during the taxable year. The amount of his basis depended upon the effect of his disposition of other shares in an earlier year. Contrary to the Fifth Circuit's reading of *Foster*, we did *not* add to the basis of the taxpayer's remaining shares the entire basis of his surrendered shares. Following *Budd International Corp. v. Commissioner, supra*, and *Miller v. Commissioner, supra*, we held that the taxpayer had suffered a deductible loss in the earlier year, and that *only* the portion of his basis in the surrendered shares that was not allowable as a loss in the earlier year was added to his basis in his remaining shares to decrease his recognized gain upon his ultimate disposition of his remaining shares during the taxable year before the Court.

[11]Likewise, the Fifth Circuit's observation in *Schleppy v. Commissioner, supra*, that there were no appellate decisions in the area (601 F.2d at 198) is questionable even when limited to stock surrenders. The Seventh Circuit affirmed our decision in *Wright v. Commissioner, supra*, involving a surrender to the corporation for reissue to a third party, holding that the taxpayer had suffered a deductible loss. The Third Circuit affirmed *Burdick, Executrix v. Commissioner, supra*, a case involving a transfer to a third party. The Court of Claims has similarly allowed a loss on a third-party transfer. *Peabody Coal Co. v. United States, supra*. Other courts have allowed loss deductions in bargain sales to third parties, and these decisions are generally cited along with *Wright* and its progeny. See *Berner v. United States, supra; Scherman v. Helvering, supra; Kress v. Stanton, supra*.

Circuit's implicit reliance on a "unitary view" of stock ownership. Given the Sixth Circuit's view of section 83 and the pertinent regulation, that court did not have before it the issue presented in the instant case.

At the bottom of the majority's opinion today seems to be a policy choice not to allow an ordinary loss for the disposition of a capital asset. Many of the older cases allowing the loss deductions arose before the ordinary-loss, capital-loss question became relevant, but these decisions were firmly grounded in the basic rules for loss recognition. I think that it is inappropriate to warp those loss-recognition rules in the present cases merely to avoid allowing an ordinary-loss deduction. Capital treatment of gain or loss on a "sale or exchange" of a capital asset is clear. Secs. 165(f), 1201–1212. However, not every disposition of a capital asset is a "sale or exchange" so as to generate capital gain or loss. See *National-Standard Co. v. Commissioner*, 80 T.C. 551 (1983). See generally Bittker, "Capital Gains and Losses—The 'Sale or Exchange' Requirement," 32 Hastings L.J. 743 (1981). Congress has acted many times to mandate sale or exchange treatment for various transactions,[12] and I think congressional action rather than judicial revision is the appropriate response in this area.

I am also unpersuaded by the majority's attempt to buttress its policy choice by its stated concern over the tax-avoidance potential and the purported evisceration of section 165(g). I do not perceive in the previous cases the abuse the majority seems to find, and I am confident that traditional tax common law doctrines (substance over form, step transaction, sham, etc.) are sufficient to deal with any abuses that arise. Moreover, the taxpayer bears the burden of proving his deductible loss. *Sack v. Commissioner*, 33 T.C. 805 (1960); *Clement v. Commissioner*, 30 B.T.A. 757 (1934); Rule 142(a), Tax Court Rules of Practice and Procedure. This burden, in proper cases, would include the bonafides of his claimed motivation for the stock surrender. If a taxpayer surrenders shares with a genuine goal of preserving his corporation's existence (as opposed to an anticipatory triggering of a loss from a soon-to-be-worthless stock investment), I see no reason why, as a policy matter, an ordinary-loss deduction should not be allowed.

---

[12]See, e.g., secs. 165(g), 331, 1231, 1234(a), 1234A, 1241.

I am also troubled by the signal the majority sends as to the future of stare decisis in this Court. I would not reverse course at this late date. This Court staked out its position on the issue in 1929 and had consistently adhered to it until today. The arguments on each side are really no different today than they were 55 years ago. The issue raised in this case has been before the Court conference seven times.[13] Less than 4 years ago, in *Tilford v. Commissioner, supra,* we adhered to our consistent line of case law. We did so even though *Schleppy* had already been decided by the Fifth Circuit, and we did so even though it meant invalidating a Treasury regulation. I see no reason to depart from stare decisis now.

The Fifth and Sixth Circuits have neither expressly considered nor rejected the rationale underlying our cases allowing a loss deduction. I believe that we made the correct decision in 1929, and I dissent from the majority's rejection of that decision.

FAY, GOFFE, and WILES, *JJ.,* agree with this dissent.

---

[13]See *Wright v. Commissioner, supra; Burdick, Executrix v. Commissioner, supra; City Builders Finance Co. v. Commissioner, supra; Estate of Foster v. Commissioner, supra; Downer v. Commissioner, supra; Tilford v. Commissioner, supra.* In *Clement v. Commissioner, supra,* we adhered to the rationale of the decisions allowing the deductible loss, but held that the taxpayer had failed to prove the amount of his loss.